Original
No. 2002-243

SENATOR CLIFTON BELOW & a.

v.

WILLIAM M. GARDNER, SECRETARY OF STATE

Argued: June 11, 2002
Opinion Issued: June 24, 2002

*Wiggin & Nourie, P.A.*, of Manchester (*John P. Kacavas* on the memorandum and orally), *Shaheen & Gordon, P.A.*, of Concord (*Steven M. Gordon* on the memorandum), and *Nixon Peabody, L.L.P.*, of Manchester (*W. Scott O'Connell* on the memorandum), for the petitioners.

*Barry J. Glennon*, staff attorney, of Concord, filed no memorandum, for the Secretary of State.

*Richard J. Lehmann*, senate legal counsel, by memorandum and orally, for the intervenor, the New Hampshire Senate.

*Douglas, Robinson, Leonard & Garvey, P.C.*, of Concord (*Charles G. Douglas, III*, on the memorandum and orally), for the intervenor, the President of the New Hampshire Senate.

PER CURIAM. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Part I, Article 11 of the New Hampshire Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantee to the people of New Hampshire the equal right to vote. To assure that right, the supreme court has been called upon to establish a new district plan for the New Hampshire Senate.

This task has fallen to the court because the New Hampshire Legislature failed to enact a new district plan for the New Hampshire Senate following the 2000 census. *See* N.H. CONST. pt. II, art. 26. Part II, Article 26 of the State Constitution requires the legislature to redistrict the senate at the regular session following every federal decennial census. The New Hampshire Legislature prepared a senate redistricting plan that was passed by both houses, but was vetoed by the Governor. The legislature did not override the Governor's veto and recessed without enacting a valid senate redistricting plan into law.

Under Part II, Article 26, the existing senate districts are not constitutionally apportioned and, thus, violate the equal voting rights of New Hampshire citizens. *See* U.S. CONST. amend. XIV; N.H. CONST. pt. I, art. 11. Accordingly, the court must redraw the senate districts to preserve the equal protection and equal voting rights of the citizens. *See Wilson v. Eu*, 823 P.2d 545, 547 (Cal. 1992).

## I. Background and Procedural History

The New Hampshire Senate is comprised of twenty-four single-member district seats. *See* N.H. CONST. pt. II, arts. 25, 26. The State Constitution requires the legislature to redraw each senate seat into a single member district "as nearly equal as may be in population" every ten years, based upon the federal decennial census. N.H. CONST. pt. II, arts. 11, 26. The senate began the process of redistricting in February 2001.

The legislature received the 2000 census data in March 2001. According to the census, New Hampshire experienced a 10% growth in population between 1990 and 2000, increasing from 1,109,252 citizens in 1990 to 1,235,786 citizens in 2000. This growth was unevenly distributed between the northern and southern portions of the State, however, with the largest population growth occurring in the south. As a result, it is undisputed that following the 2000 census, the existing senate districts, established in 1992 pursuant to the 1990 census, violate both the State and Federal Constitutions. *See* N.H. CONST. pt. I, art. 11; N.H. CONST. pt. II, art. 26; U.S. CONST. amend. XIV; RSA 662:3 (1996).

Using the 2000 decennial census, the ideal population for each senatorial district is 51,491. The current senatorial districts vary in population from a high of 60,334 (+17.17% deviation from the ideal district population) to a low of 44,229 (-14.10% deviation from the ideal district population). Adding the largest positive deviation and the largest negative deviation, without regard to algebraic sign (absolute value), yields the overall range of deviation. *See Abrams v. Johnson*, 521 U.S. 74, 98 (1997). The overall range of deviation from the ideal population is 31.27%. This is considerably higher than the range permissible under the Federal

Constitution for a legislatively drawn district plan. *See Brown v. Thomson,* 462 U.S. 835, 842-43 (1983) (overall range of deviation from ideal district population that is lower than 10% is insufficient to establish a *prima facie* case of discrimination under Equal Protection Clause of Federal Constitution); *Mahan v. Howell,* 410 U.S. 315, 329 (1973) (overall range of deviation of 16.4% "may well approach tolerable limits").

In January 2002, after a series of public hearings on a number of proposed redistricting plans, the Republican leadership introduced senate bill (SB) 1, which set forth a proposed new district plan for the senate based upon the 2000 census. SB 1 was passed by both the senate and the house along party lines. The Governor vetoed the bill, however, on March 29, 2002. The senate considered the Governor's veto on May 22, 2002, the last day of its regular session, but was unable to override it. As a result, SB 1 did not become law. *See* N.H. CONST. pt. II, art. 44 (requiring that "every bill" passed by both houses of the legislature be signed by the Governor before becoming law, unless two-thirds of both houses override the Governor's veto).

The jurisdiction of the court was invoked in April 2002, when eleven senate Democrats filed a petition for original jurisdiction requesting the court to declare the existing State senate districts unconstitutional and to impose a deadline for the legislature to enact a valid senate redistricting plan. Given the need to establish a redistricting plan consistent with constitutional requisites before the 2002 senate election, we accepted jurisdiction. *See Monier v. Gallen,* 122 N.H. 474, 476 (1982).

On May 22, 2002, the senate and the house recessed without enacting a valid senate redistricting plan. On May 23, 2002, the court determined, that since it had no assurance that a redistricting plan would be validly enacted in time for the upcoming election, it must establish a constitutional senate redistricting plan. *See Reynolds v. Sims,* 377 U.S. 533, 585 (1964); *Connor v. Finch,* 431 U.S. 407, 415 (1977).

The court endeavored to accomplish the task of redistricting the New Hampshire Senate as fairly, efficiently and quickly as possible, given the imminence of the scheduled September primary. It ordered the parties to submit constitutional redistricting proposals by June 6, 2002; new plans submitted after that date were not considered. The court further required that any proposal submitted be based upon the 2000 census data and comply with the constitutional principle of one person/one vote. Oral argument was scheduled and held on June 11, 2002. This decision follows thirteen days after oral argument.

Because this case is an "extraordinary [one] where the introduction of outside skills and expertise, not possessed by the judge, will hasten the just adjudication of a dispute without dislodging the delicate balance of the

juristic role," *Reilly v. United States*, 863 F.2d 149, 156 (1st Cir. 1988), the court informed the parties of its intent to appoint Bobby Bowers, Director of the South Carolina Budget and Control Board Office of Research and Statistics, as its technical advisor. After reviewing and dismissing the single objection it received regarding Bowers' appointment, the court appointed him as its technical advisor pursuant to its inherent authority. *See id. See generally State v. Coon*, 974 P.2d 386, 395-96 (Alaska 1999) (discussing authority of courts to appoint expert technical advisors). Bowers was appointed to aid the court in understanding the relevant terminology and technology associated with redistricting, to help the court understand the redistricting plans submitted by the parties, and, where necessary, to assist the court in the technical aspects of the redistricting plan.

The court received four senate district plans for consideration. The court has reviewed each plan in detail and has also considered the written and oral submissions of all parties.

## II. Governing Principles

"Reapportionment is primarily a matter of legislative consideration and determination." *Monier*, 122 N.H. at 476 (quotation omitted); *see Reynolds*, 377 U.S. at 586. "[A] state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality." *Connor*, 431 U.S. at 414-15. Thus, we undertake the "unwelcome obligation of performing in the legislature's stead" gingerly, mindful that, as a court, we "possess no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name." *Id.* at 415. Had the legislature complied with its obligation to reapportion "according to . . . constitutional requisites in a timely fashion," our intervention would have been unnecessary. *Monier*, 122 N.H. at 476; *see Reynolds*, 377 U.S. at 586.

### A. One Person/One Vote

#### 1. History of Part II, Article 26

We begin with a discussion of the one person/one vote standard under our own constitution. The New Hampshire Constitution guarantees that each citizen's vote will have equal weight. N.H. CONST. pt. I, art. 11. To ensure this right, Part II, Article 26 of the State Constitution, as amended in 1964, requires that the State be divided into "single-member [senate] districts, as nearly equal as may be in population." N.H. CONST. pt. II, art.

26. This is our first opportunity to interpret the phrase "as nearly equal as may be in population."

This phrase was added to Part II, Article 26 as a result of the Constitutional Convention in 1964. *See* JOURNAL OF CONSTITUTIONAL CONVENTION 305, 317 (1964). Prior to the 1964 amendment, senate districts were apportioned on the basis of taxes, not population. *See Levitt v. Maynard*, 104 N.H. 243, 245 (1962). "New Hampshire [was] the only state which . . . carried the principle of no taxation without representation to its ultimate conclusion. Its Senate districts [were] determined by the proportion of direct taxes paid by the said districts." *Id.* (quotations omitted). Prior to 1964, Part II, Article 26 read as follows:

> And that the state may be equally represented in the senate, the legislature shall, from time to time divide the state into twenty-four districts, as nearly equal as may be without dividing towns and unincorporated places; and in making this division, they shall govern themselves by the proportion of direct taxes paid by the said districts, and timely make known to the inhabitants of the state the limits of each district.

*Id.* (quotation omitted).

Even though the constitution required redistricting, before the 1964 amendment the legislature rarely redistricted the senate. Indeed, senate districts drawn in 1915 were not redrawn until 1961. *See id.*

In 1964, a resolution was introduced at the Constitutional Convention seeking to change the basis for senate apportionment from taxes to population. The matter came to the convention "[a]s a result of recent decisions by the United States Supreme Court" and the concern that "[i]t [was] only a matter of time before our system of apportioning State Senate Districts according to taxable property" was declared unconstitutional. JOURNAL OF CONSTITUTIONAL CONVENTION, *supra* at 48.

Approximately one week after the convention began, the United States District Court for the District of New Hampshire issued its opinion in *Levitt v. Stark*, 233 F. Supp. 566 (D.N.H. 1964). In *Levitt*, the federal court stated that it "entertain[ed] serious doubt of the federal constitutional validity of the New Hampshire method for selecting the members of the legislature." *Levitt*, 233 F. Supp. at 569. The court noted, however, that the United States Supreme Court had not yet held that both houses of a bicameral state legislature had to be apportioned on the basis of population, and intimated that if only one of the houses of the New Hampshire Legislature were apportioned on the basis of population, the other house might survive federal court scrutiny. *Id.*

The convention, at first, wrestled with making changes to the method of apportioning the house of representatives. When this proved too difficult, the convention turned its attention to senate apportionment. JOURNAL OF CONSTITUTIONAL CONVENTION, *supra* at 272. As one of the delegates noted:

> I have stood before groups repeatedly and told them that it was not necessary to adjust the House situation as long as we adjusted the Senate situation. . . . [Y]esterday we did not adjust the House situation so as to make it consonant with what the Supreme Court wants. . . . But what is important right now is that we put the Senate on a population basis because of the fact that we have left the House as we left it yesterday. . . . Now if we make our Senate consonant with the principle of equality in representation, then what we did yesterday is fine. If we don't here today make it consonant, we have left ourselves open to question.

*Id.* at 272-73.

The convention thus resolved to amend Part II, Article 26 to make clear that senate districts would be apportioned based upon population equality and would be redrawn every ten years, following the decennial census. *Id.* at 280. As a result of the convention's resolution, in November 1964, voters were asked, "Are you in favor of amending the constitution to apportion the senate districts on the basis of population as equally as possible without dividing any town, ward or place?" *Id.* at 305. Consequently, Part II, Article 26 was amended to state:

> And that the state may be equally represented in the senate, the legislature shall divide the state into single-member districts, as nearly equal as may be in population, each consisting of contiguous towns, city wards and unincorporated places, without dividing any town, city ward or unincorporated place. The legislature shall form the single-member districts at its next session after approval of this article by the voters of the state and thereafter at the regular session following each decennial federal census.

N.H. CONST. pt. II, art. 26.

■ In light of the history of the 1964 amendment to Part II, Article 26, we hold that the phrase "as nearly equal as may be in population" is at least as protective of the citizens' voting rights as the federal constitutional standard of one person/one vote. Accordingly, we need not undertake a

separate federal analysis and we base this decision upon Part II, Article 26. *See State v. Ball*, 124 N.H. 226, 233 (1983). We rely upon federal cases interpreting the Federal Constitution only to aid in our analysis. *See id.*

### 2. Substantive Requirement of One Person/One Vote

■ Under the State Constitution, "there can be room for but a single constitutional rule — one voter, one vote." *Gray v. Sanders*, 372 U.S. 368, 382 (1963) (Stewart, J., concurring). Our constitution requires therefore that the State Legislature be apportioned so that each person's vote carries as near equal weight as possible. *See Reynolds*, 377 U.S. at 588 (Clark, J., concurring). "[T]he overriding objective [of redistricting] must be substantial equality of population among the various [legislative] districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Id.* at 579. However, a State need not achieve "absolute population equality" with respect to state legislative districts. *Karcher v. Daggett*, 462 U.S. 725, 732-33 (1983).

■ The degree to which a state legislative district plan may vary from absolute population equality depends, in part, upon whether it is implemented by the legislature or by a court. State legislatures have more leeway than courts to devise redistricting plans that vary from absolute population equality. *See Chapman v. Meier*, 420 U.S. 1, 26-27 (1975).

■ With respect to "a court plan, *any* deviation from approximate population equality must be supported by enunciation of historically significant state policy or unique features." *Id.* at 26 (emphasis added). Absent persuasive justifications, a court-ordered redistricting plan of a state legislature "must ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Id.* at 26-27. The latitude in court-ordered plans to depart from population equality thus "is considerably narrower than that accorded apportionments devised by state legislatures, and ... the burden of articulating special reasons for following ... a [state] policy in the face of substantial population inequalities is correspondingly higher." *Connor*, 431 U.S. at 419-20.

However, "[n]either courts nor legislatures are furnished any specialized calipers that enable them to extract from the general language of the ... [constitution] the mathematical formula that establishes what range of percentage deviations is permissible, and what is not." *Mahan*, 410 U.S. at 329.

The senate and senate president argue that because we are a state court, we should use the standard applied to state legislatures rather than the standard applied to federal district courts. We disagree.

■All courts called upon to make redistricting decisions are governed by the same measure of restraint. Unlike legislatures, courts engaged in redistricting primarily view the task through the lens of the one person/one vote principle and all other considerations are given less weight. *See Connor*, 431 U.S. at 415. "The framers in their wisdom entrusted this decennial exercise to the legislative branch because the give-and-take of the legislative process, involving as it does representatives elected by the people to make precisely these sorts of political and policy decisions, is preferable to any other." *Jensen v. Wisconsin Elections Bd.*, 639 N.W.2d 537, 540 (Wis. 2002). We believe, therefore, that we too must accomplish our task "circumspectly, and in a manner free from any taint of arbitrariness or discrimination," *Connor*, 431 U.S. at 415 (quotation omitted), and that the high standard that governs a federal court-enacted redistricting plan applies to any plan we adopt.

### B. Other State Constitutional Principles

■In addition to requiring that senate districts be "as equal as may be in population," the New Hampshire Constitution mandates that: (1) senate districts be comprised of "contiguous" towns, city wards and unincorporated places; (2) no town, city ward or unincorporated place may be divided unless the town, city ward or unincorporated place requests division by referendum; and (3) each senate district must elect only one senator. N.H. CONST. pt. II, arts. 26, 26-a. These additional requirements, however, are secondary to the overriding constitutional principle of one person/one vote. *See In re Legislative Districting*, 475 A.2d 428, 439 (Md. 1984); *In re Senate Bill 177*, 318 A.2d 157, 160 (Vt. 1974); *Rice v. English*, No. 1010968, 2002 WL 1052048 at *2 (Ala. 2002).

Contiguity may be a valid consideration in districting a state legislative body. *See Reynolds*, 377 U.S. at 578-79. "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme." *Id.* at 578. Courts generally agree that contiguous territory is territory that touches, adjoins or is connected, as distinguished from territory that is separated by other territory. *See In re Legislative Districting*, 475 A.2d at 436; *Hickel*, 846 P.2d at 45; *In re Sherill*, 81 N.E. 124, 131 (N.Y. 1907).

Other States considering similar constitutional provisions have held that the contiguity requirement is intended to prevent partisan gerrymandering. *See In re Legislative Districting*, 475 A.2d at 436; *see also Reynolds*, 377 U.S. at 578-79. Political gerrymandering is "[t]he practice of dividing a geographical area into electoral districts, often of

highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength." BLACK'S LAW DICTIONARY 696 (7th ed. 1999); *see also Hickel v. Southeast Conference*, 846 P.2d 38, 45 (Alaska 1992).

The State Constitution also requires that each of the twenty-four senate districts be single-member districts, which means that each district elects only one senator.

### III. Plans Submitted by the Parties

We have reviewed each submitted plan against the neutral constitutional principles set forth above.

#### A. Petitioners' Plan

The petitioners assert their plan is a "least change" approach, in which they endeavored to maintain "constituency consistency" to the "greatest extent practicable." They aver that the overall range of deviation from the ideal senate district population in their plan is 4%.

The petitioners' plan is flawed because it does not rest entirely upon the federal census data, as required by law. "Our State Constitution establishes only one yardstick as a legislative guide in making an apportionment. That yardstick is the last general census of the inhabitants of the state taken by authority of the United States or of this state." *McGovern v. Secretary of State*, 138 N.H. 128, 131 (1993) (quotation omitted).

While data from the federal census (referred to as PL 94-171 census data) reflects ward populations based upon the ward lines in effect as of April 1, 2000, some of the data used by the petitioners reflect ward populations based upon the ward lines *changed* after April 1, 2000. Some of the ward populations used by the petitioners are not the same as the ward populations contained in the PL 94-171 census data. For example, the petitioners use an adjusted population of 9,088 for Manchester ward 6, while the population for Manchester ward 6 is 10,678 in the PL 94-171 census data. Thus, there are some discrepancies between the petitioners' ward populations and the PL 94-171 census data ward populations.

The petitioners used the PL 94-171 census data for all city wards except those in the cities of Claremont, Rochester, Manchester, Keene, Nashua and Dover. When the PL 94-171 data is substituted for those cities, the overall range of population deviation is actually 7.92%. In addition, the petitioners' plan changes the senate districts for 32.89% of the State's population (406,493 citizens) and district 7 is no longer comprised of contiguous territory.

The senate president argues that the petitioners' plan artificially divides the cities of Concord, Laconia and Dover for partisan political advantage. The senate president also argues that some of the districts in the petitioners' plan are oddly shaped and are not comprised of contiguous territory for the sole purpose of protecting Democrat incumbents and targeting Republican incumbents. For instance, one district contains both a ward of the city of Manchester and a ward of the city of Nashua, even though these wards do not touch by land, but instead border a common waterway.

Even if the senate president's criticisms are accurate, we note that while these types of political considerations may be permissible in legislatively-implemented redistricting plans, they have no place in a court-ordered remedial plan. *See Wilson*, 823 P.2d at 576-77; *see also Wyche v. Madison Parish Police Jury*, 769 F.2d 265, 268 (5th Cir. 1985) (per curiam).

### B. Senate President's Plans

The senate president has proposed two alternative plans for the court's consideration. The first plan is a "compromise plan," which the senate president asserts "is the next closest plan to the legislature's intent." According to the senate president, the "compromise plan" represents the results of weeks of negotiation between the senate Republicans and Democrats. It is said to combine elements of SB 1, the plan supported by the Republicans, and of the plan supported by the Democrats and submitted by the petitioners, and is alleged to have an overall range of population deviation of 9.83%. The second plan is a "deviation plan," which the senate president asserts has an overall range of deviation of less than 4% from the ideal district population.

Both plans are flawed for the same reasons as are the petitioners' plans. Like the petitioners, the senate president did not rely solely upon federal census data, but instead relied upon ward population data that differed from the data reported in the federal census.

The senate president's "compromise plan" used the PL 94-171 census data base for all city wards except for those in Manchester and Nashua. When the PL 94-171 data is substituted for those cities, the overall range of population deviation is actually 9.2%, and the plan changes the senate districts for 24.10% of the State's population (297,846 citizens).

The senate president's "deviation plan" used the PL 94-171 census data base for all city wards except those in Manchester, Nashua and Concord. When the PL 94-171 data is substituted for those cities, the overall range of population deviation is actually 5.4%, and the plan changes the senate districts for 34.74% of the State's population (429,310 citizens).

As with the petitioners' plan, the plans submitted by the senate president embody political considerations. Although the senate president claims the "compromise plan" is a product of weeks of negotiation between senate Republicans and Democrats, it was not adopted. The "deviation plan" is similarly laden with political considerations. Although SB 1 was modified to achieve a lower overall range of deviation, the plan is in many respects similar to the plan supported by senate Republicans and rejected by senate Democrats.

### C. Senate Plan

The senate has submitted the plan contained in SB 1, with some minor modifications. We do not adopt the senate's proposed plan for the same reasons that we do not adopt the other submitted plans. The senate's proposed plan does not rest entirely upon federal census data. When the PL 94-171 data is substituted, the senate plan's overall range of population deviation is actually 9.66%.

Like the other submitted plans, the senate's plan changes the senate districts of a significant portion of the State's population. It changes the districts for 31.10% of the State's population (384,391 citizens). Also, like the other submitted plans, the senate's plan seeks partisan advantage. It is most similar to SB 1, the plan supported by senate Republicans and opposed by senate Democrats.

### D. SB 1

The senate and senate president argue that we must either order elections to take place pursuant to SB 1 or use it as our starting point in devising a redistricting plan of our own. We decline both options for the reasons set forth below.

We do not adopt SB 1 as the court's plan because, like the other plans submitted by the parties, it fails to comply with the neutral constitutional criteria required of court-ordered remedial plans. Like the plans submitted by the parties, SB 1 does not rely exclusively upon PL 94-171 census data. SB 1 relies upon ward population data that differs from the data reported to the federal census. Additionally, like the plans submitted by the parties, SB 1 represents "the culmination of very specific political and, in some cases, individual agendas." *Colleton County Council v. McConnell*, Nos. CIV.A. 01-3581-10, CIV.A. 3:01-3609-10, CIV.A. 3:01-3892-10, 2002 WL 1065576 at *28 (D.S.C. 2002).

For these same reasons, we also decline to use SB 1 as our template, although as with the plans submitted by the parties, we examined it for evidence of State redistricting policy. Even though SB 1 was passed by the legislature, it did not become law, and, thus, while it is some evidence of

State redistricting policy, it is not entitled to the judicial deference accorded fully enacted redistricting plans. *See Prosser v. Elections Bd.*, 793 F. Supp. 859, 867 (W.D. Wis. 1992). Only fully enacted plans "have the virtue of political legitimacy." *Id.*

For all of the above reasons, we conclude that none of the submitted plans is appropriate for adoption by the court. As explained above, each plan relies upon different data. Each plan has "calculated partisan political consequences (the details of which are unknown). We have no principled way to choose [among] the plans, especially knowing that we would be endorsing an unknown but intended political consequence by the choice we make." *Wilson*, 823 P.2d at 576-77. Accordingly, the court has devised a redistricting plan consistent with neutral State and federal constitutional principles.

*IV. Court Plan*

The goal of the court's plan is to remedy the constitutional deficiencies in the existing senate districts. In devising the plan, we are guided primarily by the State and federal constitutional principles of one person/one vote. Also, we use as our benchmark the existing senate districts because the senate districting plan enacted in 1992 is the last validly enacted plan and is the "clearest expression of the legislature's intent." *Colleton County Council*, 2002 WL 1065576 at *24. We consider the 1992 senate plan to be the best evidence of State redistricting policy. In addition, by using the existing senate districts, we are able to ensure, to the greatest extent practicable, that each senatorial district contains roughly the same constituents as the last validly enacted plan. And, we adhere to the New Hampshire constitutional requirements that each senate district be a single-member district comprised of contiguous towns, city wards and unincorporated places and that each town, city ward and unincorporated place not be divided. N.H. CONST. pt. II, art. 26.

With these principles in mind, we have determined that to remedy the population deviations in existing districts, it is preferable that the *core* of those districts be maintained, while contiguous populations are added or subtracted as necessary to correct the population deviations.

The court's plan has an overall range of deviation of only 4.96%, and, thus, satisfies the one person/one vote standard.

As referred to above, the court was informed that, in certain cities, ward lines may have been changed since the 2000 census was conducted, and that it was not known whether such changes were made using the PL 94-171 census data. For example, we have been advised that Manchester and Nashua have adjusted ward lines since the 2000 census data was released,

making these ward lines inconsistent with the PL 94-171 data as reported for those wards. We have also been advised that Rochester has added a ward since the 2000 census data was released, making its wards similarly inconsistent with the PL 94-171 data.

However, because no party provided us with all of the necessary data, the court's plan relies exclusively upon the PL 94-171 census data, which was provided by the Bureau of the Census for redistricting purposes. Wherever such changes have been made, it will be the responsibility of the appropriate officials to conform the ward lines to the PL 94-171 data or to make internal election process accommodations.

Further, unlike the plans submitted by the parties, the court's plan imposes the least change for New Hampshire citizens in that it changes the senate districts for only 18.82% of the State's population (232,565 citizens).

Moreover, all of the court's senate districts are single-member districts and they are each comprised of contiguous towns, city wards and unincorporated places. N.H. CONST. pt. II, art. 26. Consistent with the New Hampshire Constitution, the court's plan does not divide any town, city ward or unincorporated place throughout the entire State. The plan also splits only two cities, Manchester and Nashua, which were also split in the redistricting plan enacted in 1992. The plan is drawn without any consideration of partisan politics.

Because the legislature failed to meet the mandate of Part II, Article 26 of the New Hampshire Constitution, the court has been called upon to assure that that requirement is met. It is in fulfillment of that requirement that the court has adopted the plan for formation of senate districts attached to this opinion. This plan is effective immediately and the injunction against the senate filing period is dissolved as of 12:01 a.m. June 26, 2002. Unless otherwise ordered by the court, the filing of any motion to reconsider shall not stay the effective date of the plan.

*So ordered.*

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.

## *INDEX TO APPENDICES*

[as modified by Order on Motion to Reconsider
dated July 11, 2002; full text of Order follows appendices]

Senate District Plan (State Map) .....................................................Appendix A
Senate District Population Report................................................Appendix B
Full Geography Report with Population Totals ...........................Appendix C

# APPENDIX A

State of New Hampshire
Senate Districts
Supreme Court Final Plan 2002
with Townships and Adjusted City Wards
for Manchester and Nashua

# APPENDIX B

State of New Hampshire
Senate Districts
Supreme Court Final Plan 2002

| DISTRICT | | | | TABLACK | | TAAMERIN | | TAHAWPAC | |
|---|---|---|---|---|---|---|---|---|---|
| 01 | 50536 | 51491 | -1.85% | 72 | 343 | 168 | 224 | 11 | 118 |
| 02 | 50685 | 51491 | -1.57% | 130 | 319 | 93 | 273 | 14 | 126 |
| 03 | 50501 | 51491 | -1.92% | 80 | 271 | 150 | 179 | 1 | 73 |
| 04 | 50701 | 51491 | -1.53% | 155 | 387 | 164 | 272 | 9 | 79 |
| 05 | 50478 | 51491 | -1.97% | 345 | 649 | 148 | 1195 | 16 | 202 |
| 06 | 52623 | 51491 | 2.20% | 247 | 542 | 105 | 429 | 15 | 175 |
| 07 | 50632 | 51491 | -1.67% | 131 | 393 | 112 | 214 | 10 | 102 |
| 08 | 51062 | 51491 | -0.83% | 118 | 302 | 183 | 208 | 8 | 60 |
| 09 | 50773 | 51491 | -1.39% | 273 | 499 | 79 | 636 | 14 | 104 |
| 10 | 50469 | 51491 | -1.98% | 161 | 371 | 142 | 253 | 24 | 95 |
| 11 | 50772 | 51491 | -1.40% | 319 | 459 | 87 | 441 | 7 | 120 |
| 12 | 53023 | 51491 | 2.98% | 699 | 2163 | 148 | 1171 | 21 | 916 |
| 13 | 50214 | 51491 | -2.48% | 1088 | 3373 | 149 | 2355 | 16 | 1753 |
| 14 | 50846 | 51491 | -1.25% | 332 | 756 | 85 | 543 | 19 | 211 |
| 15 | 52065 | 51491 | 1.11% | 458 | 648 | 147 | 644 | 13 | 146 |
| 16 | 51781 | 51491 | 0.56% | 578 | 907 | 108 | 1047 | 10 | 295 |
| 17 | 51688 | 51491 | 0.38% | 191 | 410 | 110 | 159 | 14 | 149 |
| 18 | 52245 | 51491 | 1.46% | 856 | 2230 | 149 | 1015 | 12 | 724 |
| 19 | 53027 | 51491 | 2.98% | 358 | 814 | 85 | 574 | 33 | 255 |
| 20 | 52265 | 51491 | 1.50% | 1002 | 2255 | 193 | 822 | 22 | 976 |
| 21 | 51817 | 51491 | 0.63% | 455 | 570 | 104 | 1130 | 39 | 153 |
| 22 | 52951 | 51491 | 2.84% | 236 | 802 | 95 | 865 | 18 | 295 |
| 23 | 52597 | 51491 | 2.15% | 200 | 491 | 81 | 528 | 9 | 178 |
| 24 | 52035 | 51491 | 1.06% | 551 | 535 | 79 | 754 | 16 | 115 |
| Unassigned | 0 | | | 0 | 0 | 0 | 0 | 0 | 0 |
| | 1235786 | | | 9035 | 20489 | 2964 | 15931 | 371 | 7420 |

# APPENDIX C

State of New Hampshire Senate Districts
Supreme Court Final Plan 2002
Full Geography Report with Population Totals

| District | County | Township | Ward | Population |
|---|---|---|---|---|
| 01 | Carroll County | Albany | | 654 |
| 01 | Carroll County | Bartlett | | 2705 |
| 01 | Carroll County | Hale's location | | 58 |
| 01 | Carroll County | Hart's Location | | 37 |
| 01 | Carroll County | Jackson | | 835 |
| 01 | Coos County | Atkinson and Gilmanton Academy | | 12 |
| 01 | Coos County | Beans grant | | 0 |
| 01 | Coos County | Beans purchase | | 4 |
| 01 | Coos County | Berlin city | | 10331 |
| 01 | Coos County | Cambridge | | 10 |
| 01 | Coos County | Carroll | | 663 |
| 01 | Coos County | Chandlers purchase | | 0 |
| 01 | Coos County | Clarksville | | 294 |
| 01 | Coos County | Colebrook | | 2321 |
| 01 | Coos County | Columbia | | 750 |
| 01 | Coos County | Crawfords purchase | | 0 |
| 01 | Coos County | Cutts grant | | 0 |
| 01 | Coos County | Dalton | | 927 |
| 01 | Coos County | Dixs grant | | 0 |
| 01 | Coos County | Dixville | | 75 |
| 01 | Coos County | Dummer | | 309 |
| 01 | Coos County | Errol | | 298 |
| 01 | Coos County | Ervings location | | 1 |
| 01 | Coos County | Gorham | | 2895 |
| 01 | Coos County | Greens grant | | 0 |
| 01 | Coos County | Hadleys purchase | | 0 |
| 01 | Coos County | Jefferson | | 1006 |
| 01 | Coos County | Kilkenny | | 0 |
| 01 | Coos County | Lancaster | | 3280 |
| 01 | Coos County | Low and Burbanks grant | | 0 |
| 01 | Coos County | Martins location | | 0 |
| 01 | Coos County | Milan | | 1331 |
| 01 | Coos County | Millsfield | | 22 |
| 01 | Coos County | Northumberland | | 2438 |
| 01 | Coos County | Odell | | 5 |
| 01 | Coos County | Pinkhams grant | | 0 |
| 01 | Coos County | Pittsburg | | 867 |
| 01 | Coos County | Randolph | | 339 |
| 01 | Coos County | Sargents purchase | | 0 |
| 01 | Coos County | Second College grant | | 0 |
| 01 | Coos County | Shelburne | | 379 |
| 01 | Coos County | Stark | | 516 |
| 01 | Coos County | Stewartstown | | 1012 |
| 01 | Coos County | Stratford | | 942 |
| 01 | Coos County | Success | | 2 |
| 01 | Coos County | Thompson and Meserves purchase | | 0 |
| 01 | Coos County | Wentworth location | | 44 |
| 01 | Coos County | Whitefield | | 2038 |
| 01 | Grafton County | Bethlehem | | 2199 |
| 01 | Grafton County | Franconia | | 924 |
| 01 | Grafton County | Lincoln | | 1271 |
| 01 | Grafton County | Lisbon | | 1587 |
| 01 | Grafton County | Littleton | | 5845 |

State of New Hampshire Senate Districts
Supreme Court Final Plan 2002
Full Geography Report with Population Totals

| District County | Township | Ward | PERSONS Division |
|---|---|---|---|
| 01 Grafton County | Livermore | | 3 |
| 01 Grafton County | Lyman | | 487 |
| 01 Grafton County | Sugar Hill | | 563 |
| 01 Grafton County | Waterville Valley | | 257 |
| | **District 1** | **Total Population** | **50536** | **-1.85%** |
| 02 Belknap County | Center Harbor | | 996 |
| 02 Belknap County | Meredith | | 5943 |
| 02 Belknap County | New Hampton | | 1950 |
| 02 Belknap County | Sanbornton | | 2581 |
| 02 Grafton County | Alexandria | | 1329 |
| 02 Grafton County | Ashland | | 1955 |
| 02 Grafton County | Bath | | 893 |
| 02 Grafton County | Benton | | 314 |
| 02 Grafton County | Bridgewater | | 974 |
| 02 Grafton County | Bristol | | 3033 |
| 02 Grafton County | Campton | | 2719 |
| 02 Grafton County | Dorchester | | 353 |
| 02 Grafton County | Easton | | 256 |
| 02 Grafton County | Ellsworth | | 87 |
| 02 Grafton County | Groton | | 456 |
| 02 Grafton County | Haverhill | | 4416 |
| 02 Grafton County | Hebron | | 459 |
| 02 Grafton County | Holderness | | 1930 |
| 02 Grafton County | Landaff | | 378 |
| 02 Grafton County | Lyme | | 1679 |
| 02 Grafton County | Monroe | | 759 |
| 02 Grafton County | Orange | | 299 |
| 02 Grafton County | Orford | | 1091 |
| 02 Grafton County | Piermont | | 709 |
| 02 Grafton County | Plymouth | | 5892 |
| 02 Grafton County | Rumney | | 1480 |
| 02 Grafton County | Thornton | | 1843 |
| 02 Grafton County | Warren | | 873 |
| 02 Grafton County | Wentworth | | 798 |
| 02 Grafton County | Woodstock | | 1139 |
| 02 Merrimack County | Andover | | 2109 |
| 02 Merrimack County | Hill | | 992 |
| | **District 2** | **Total Population** | **50685** | **-1.57%** |
| 03 Carroll County | Brookfield | | 604 |
| 03 Carroll County | Chatham | | 260 |
| 03 Carroll County | Conway | | 8604 |
| 03 Carroll County | Eaton | | 375 |
| 03 Carroll County | Effingham | | 1273 |
| 03 Carroll County | Freedom | | 1303 |
| 03 Carroll County | Madison | | 1984 |
| 03 Carroll County | Moultonborough | | 4484 |
| 03 Carroll County | Ossipee | | 4211 |
| 03 Carroll County | Sandwich | | 1286 |
| 03 Carroll County | Tamworth | | 2510 |

State of New Hampshire Senate Districts
Supreme Court Final Plan 2002
Full Geography Report with Population Totals

| District | County | Township | | MAPERSONSDev... |  |
|----------|--------|----------|---|---------|--|
| 03 | Carroll County | Tuftonboro | | 2148 | |
| 03 | Carroll County | Wakefield | | 4252 | |
| 03 | Carroll County | Wolfeboro | | 6083 | |
| 03 | Strafford County | Farmington | | 5774 | |
| 03 | Strafford County | Middleton | | 1440 | |
| 03 | Strafford County | Milton | | 3910 | |
| | | **District 3** | **Total Population** | **50501** | **-1.92%** |
| 04 | Belknap County | Alton | | 4502 | |
| 04 | Belknap County | Barnstead | | 3886 | |
| 04 | Belknap County | Belmont | | 6716 | |
| 04 | Belknap County | Gilford | | 6803 | |
| 04 | Belknap County | Gilmanton | | 3060 | |
| 04 | Belknap County | Laconia city | | 16411 | |
| 04 | Belknap County | Tilton | | 3477 | |
| 04 | Strafford County | New Durham | | 2220 | |
| 04 | Strafford County | Strafford | | 3626 | |
| | | **District 4** | **Total Population** | **50701** | **-1.53%** |
| 05 | Grafton County | Canaan | | 3319 | |
| 05 | Grafton County | Enfield | | 4618 | |
| 05 | Grafton County | Grafton | | 1138 | |
| 05 | Grafton County | Hanover | | 10850 | |
| 05 | Grafton County | Lebanon city | | 12568 | |
| 05 | Merrimack County | Danbury | | 1071 | |
| 05 | Merrimack County | New London | | 4116 | |
| 05 | Merrimack County | Newbury | | 1702 | |
| 05 | Merrimack County | Sutton | | 1544 | |
| 05 | Merrimack County | Wilmot | | 1144 | |
| 05 | Sullivan County | Grantham | | 2167 | |
| 05 | Sullivan County | Plainfield | | 2241 | |
| 05 | Sullivan County | Springfield | | 945 | |
| 05 | Sullivan County | Sunapee | | 3055 | |
| | | **District 5** | **Total Population** | **50478** | **-1.97%** |
| 06 | Rockingham County | Nottingham | | 3701 | |
| 06 | Strafford County | Barrington | | 7475 | |
| 06 | Strafford County | Madbury | | 1509 | |
| 06 | Strafford County | Rochester city | | 28461 | |
| 06 | Strafford County | Somersworth city | | 11477 | |
| | | **District 6** | **Total Population** | **52623** | **2.20%** |
| 07 | Hillsborough County | Antrim | | 2449 | |
| 07 | Hillsborough County | Bennington | | 1401 | |
| 07 | Hillsborough County | Deering | | 1875 | |
| 07 | Hillsborough County | Francestown | | 1480 | |
| 07 | Hillsborough County | Hancock | | 1739 | |
| 07 | Hillsborough County | Weare | | 7776 | |
| 07 | Merrimack County | Boscawen | | 3672 | |

20

| District | County | Township | Ward | PERSONS | Deviation |
|---|---|---|---|---|---|
| 07 | Merrimack County | Canterbury | | 1979 | |
| 07 | Merrimack County | Franklin city | | 8405 | |
| 07 | Merrimack County | Henniker | | 4433 | |
| 07 | Merrimack County | Hopkinton | | 5399 | |
| 07 | Merrimack County | Northfield | | 4548 | |
| 07 | Merrimack County | Salisbury | | 1137 | |
| 07 | Merrimack County | Warner | | 2760 | |
| 07 | Merrimack County | Webster | | 1579 | |
| | | **District 7** | **Total Population** | **50632** | **-1.67%** |
| 08 | Cheshire County | Alstead | | 1944 | |
| 08 | Cheshire County | Gilsum | | 777 | |
| 08 | Cheshire County | Harrisville | | 1075 | |
| 08 | Cheshire County | Marlow | | 747 | |
| 08 | Cheshire County | Nelson | | 634 | |
| 08 | Cheshire County | Roxbury | | 237 | |
| 08 | Cheshire County | Stoddard | | 928 | |
| 08 | Cheshire County | Sullivan | | 746 | |
| 08 | Cheshire County | Walpole | | 3594 | |
| 08 | Cheshire County | Westmoreland | | 1747 | |
| 08 | Hillsborough County | Hillsborough | | 4928 | |
| 08 | Hillsborough County | Windsor | | 201 | |
| 08 | Merrimack County | Bradford | | 1454 | |
| 08 | Sullivan County | Acworth | | 836 | |
| 08 | Sullivan County | Charlestown | | 4749 | |
| 08 | Sullivan County | Claremont city | | 13151 | |
| 08 | Sullivan County | Cornish | | 1661 | |
| 08 | Sullivan County | Croydon | | 661 | |
| 08 | Sullivan County | Goshen | | 741 | |
| 08 | Sullivan County | Langdon | | 586 | |
| 08 | Sullivan County | Lempster | | 971 | |
| 08 | Sullivan County | Newport | | 6269 | |
| 08 | Sullivan County | Unity | | 1530 | |
| 08 | Sullivan County | Washington | | 895 | |
| | | **District 8** | **Total Population** | **51062** | **-0.83%** |
| 09 | Hillsborough County | Bedford | | 18274 | |
| 09 | Hillsborough County | Greenfield | | 1657 | |
| 09 | Hillsborough County | Lyndeborough | | 1585 | |
| 09 | Hillsborough County | Merrimack | | 25119 | |
| 09 | Hillsborough County | New Boston | | 4138 | |
| | | **District 9** | **Total Population** | **50773** | **-1.39%** |
| 10 | Cheshire County | Chesterfield | | 3542 | |
| 10 | Cheshire County | Dublin | | 1476 | |
| 10 | Cheshire County | Fitzwilliam | | 2141 | |
| 10 | Cheshire County | Hinsdale | | 4082 | |
| 10 | Cheshire County | Keene city | | 22563 | |
| 10 | Cheshire County | Marlborough | | 2009 | |
| 10 | Cheshire County | Richmond | | 1077 | |

State of New Hampshire Senate Districts
Supreme Court Final Plan 2002
Full Geography Report with Population Totals

| District | County | Township | Ward | APERSONS Population |
|---|---|---|---|---|
| 10 | Cheshire County | Surry | | 673 |
| 10 | Cheshire County | Swanzey | | 6800 |
| 10 | Cheshire County | Troy | | 1962 |
| 10 | Cheshire County | Winchester | | 4144 |
| | | **District 10** | **Total Population** | **50469**    **-1.98%** |
| 11 | Cheshire County | Jaffrey | | 5476 |
| 11 | Cheshire County | Rindge | | 5451 |
| 11 | Hillsborough County | Amherst | | 10769 |
| 11 | Hillsborough County | Greenville | | 2224 |
| 11 | Hillsborough County | Milford | | 13535 |
| 11 | Hillsborough County | Mont Vernon | | 2034 |
| 11 | Hillsborough County | Peterborough | | 5883 |
| 11 | Hillsborough County | Sharon | | 360 |
| 11 | Hillsborough County | Temple | | 1297 |
| 11 | Hillsborough County | Wilton | | 3743 |
| | | **District 11** | **Total Population** | **50772**    **-1.40%** |
| 12 | Hillsborough County | Brookline | | 4181 |
| 12 | Hillsborough County | Hollis | | 7015 |
| 12 | Hillsborough County | Mason | | 1147 |
| 12 | Hillsborough County | Nashua city | NASHUA WARD 1 | 9551 |
| 12 | Hillsborough County | Nashua city | NASHUA WARD 2 | 9704 |
| 12 | Hillsborough County | Nashua city | NASHUA WARD 3 | 9698 |
| 12 | Hillsborough County | Nashua city | NASHUA WARD 7 | 7438 |
| 12 | Hillsborough County | New Ipswich | | 4289 |
| | | **District 12** | **Total Population** | **53023**    **2.98%** |
| 13 | Hillsborough County | Nashua city | NASHUA WARD 4 | 9943 |
| 13 | Hillsborough County | Nashua city | NASHUA WARD 5 | 9625 |
| 13 | Hillsborough County | Nashua city | NASHUA WARD 6 | 9252 |
| 13 | Hillsborough County | Nashua city | NASHUA WARD 8 | 11816 |
| 13 | Hillsborough County | Nashua city | NASHUA WARD 9 | 9578 |
| | | **District 13** | **Total Population** | **50214**    **-2.48%** |
| 14 | Hillsborough County | Hudson | | 22928 |
| 14 | Rockingham County | Auburn | | 4682 |
| 14 | Rockingham County | Londonderry | | 23236 |
| | | **District 14** | **Total Population** | **50846**    **-1.25%** |
| 15 | Merrimack County | Concord city | | 40687 |
| 15 | Merrimack County | Loudon | | 4481 |
| 15 | Merrimack County | Pembroke | | 6897 |
| | | **District 15** | **Total Population** | **52065**    **1.11%** |
| 16 | Hillsborough County | Manchester city | MANCHESTER WARD 1 | 9033 |

State of New Hampshire Senate Districts
Supreme Court Final Plan 2002
Full Geography Report with Population Totals

| District | County | Township | Ward | PERSONS | Deviation |
|---|---|---|---|---|---|
| 16 | Hillsborough County | Manchester city | MANCHESTER WARD 2 | 9073 | |
| 16 | Hillsborough County | Manchester city | MANCHESTER WARD 12 | 8679 | |
| 16 | Merrimack County | Bow | | 7138 | |
| 16 | Merrimack County | Dunbarton | | 2226 | |
| 16 | Merrimack County | Hooksett | | 11721 | |
| 16 | Rockingham County | Candia | | 3911 | |
| | | **District 16** | **Total Population** | **51781** | **0.58%** |
| 17 | Merrimack County | Allenstown | | 4843 | |
| 17 | Merrimack County | Chichester | | 2236 | |
| 17 | Merrimack County | Epsom | | 4021 | |
| 17 | Merrimack County | Pittsfield | | 3931 | |
| 17 | Rockingham County | Brentwood | | 3197 | |
| 17 | Rockingham County | Chester | | 3792 | |
| 17 | Rockingham County | Danville | | 4023 | |
| 17 | Rockingham County | Deerfield | | 3678 | |
| 17 | Rockingham County | Fremont | | 3510 | |
| 17 | Rockingham County | Northwood | | 3640 | |
| 17 | Rockingham County | Raymond | | 9674 | |
| 17 | Rockingham County | Sandown | | 5143 | |
| | | **District 17** | **Total Population** | **51688** | **0.38%** |
| 18 | Hillsborough County | Litchfield | | 7360 | |
| 18 | Hillsborough County | Manchester city | MANCHESTER WARD 5 | 9070 | |
| 18 | Hillsborough County | Manchester city | MANCHESTER WARD 6 | 8978 | |
| 18 | Hillsborough County | Manchester city | MANCHESTER WARD 7 | 9070 | |
| 18 | Hillsborough County | Manchester city | MANCHESTER WARD 8 | 8921 | |
| 18 | Hillsborough County | Manchester city | MANCHESTER WARD 9 | 8846 | |
| | | **District 18** | **Total Population** | **52245** | **1.46%** |
| 19 | Rockingham County | Derry | | 34021 | |
| 19 | Rockingham County | Hampstead | | 8297 | |
| 19 | Rockingham County | Windham | | 10709 | |
| | | **District 19** | **Total Population** | **53027** | **2.98%** |
| 20 | Hillsborough County | Goffstown | | 16929 | |
| 20 | Hillsborough County | Manchester city | MANCHESTER WARD 3 | 9013 | |
| 20 | Hillsborough County | Manchester city | MANCHESTER WARD 4 | 8900 | |
| 20 | Hillsborough County | Manchester city | MANCHESTER WARD 10 | 8715 | |
| 20 | Hillsborough County | Manchester city | MANCHESTER WARD 11 | 8708 | |
| | | **District 20** | **Total Population** | **52265** | **1.50%** |
| 21 | Rockingham County | Epping | | 5476 | |
| 21 | Strafford County | Dover city | | 26884 | |
| 21 | Strafford County | Durham | | 12664 | |
| 21 | Strafford County | Lee | | 4145 | |
| 21 | Strafford County | Rollinsford | | 2648 | |

State of New Hampshire Senate Districts
Supreme Court Final Plan 2002
Full Geography Report with Population Totals

| | | District 21 | Total Population | 51817 | 0.63% |
|---|---|---|---|---|---|
| 22 | Hillsborough County | Pelham | | 10914 | |
| 22 | Rockingham County | Atkinson | | 6178 | |
| 22 | Rockingham County | Plaistow | | 7747 | |
| 22 | Rockingham County | Salem | | 28112 | |
| | | **District 22** | **Total Population** | **52951** | **2.84%** |
| 23 | Rockingham County | East Kingston | | 1784 | |
| 23 | Rockingham County | Exeter | | 14058 | |
| 23 | Rockingham County | Kensington | | 1893 | |
| 23 | Rockingham County | Kingston | | 5862 | |
| 23 | Rockingham County | Newfields | | 1551 | |
| 23 | Rockingham County | Newmarket | | 8027 | |
| 23 | Rockingham County | Newton | | 4289 | |
| 23 | Rockingham County | Seabrook | | 7934 | |
| 23 | Rockingham County | South Hampton | | 844 | |
| 23 | Rockingham County | Stratham | | 6355 | |
| | | **District 23** | **Total Population** | **52597** | **2.15%** |
| 24 | Rockingham County | County subdivisions not defined | | 0 | |
| 24 | Rockingham County | Greenland | | 3208 | |
| 24 | Rockingham County | Hampton Falls | | 1880 | |
| 24 | Rockingham County | Hampton | | 14937 | |
| 24 | Rockingham County | New Castle | | 1010 | |
| 24 | Rockingham County | Newington | | 775 | |
| 24 | Rockingham County | North Hampton | | 4259 | |
| 24 | Rockingham County | Portsmouth city | | 20784 | |
| 24 | Rockingham County | Rye | | 5182 | |
| | | **District 24** | **Total Population** | **52035** | **1.06%** |

## Order on Motion to Reconsider (Dated July 11, 2002)

Before the court is the Senate President's motion to reconsider the court's opinion, issued June 24, 2002. Attached to his motion are affidavits from the Nashua and Manchester city clerks explaining how the clerks created new ward boundaries for their respective cities. For the first time, the court was advised that they claimed to have used federal census block equivalency data in adjusting ward lines. In a companion case, *Petition of Representative Peter Burling & a.*, the court received the official maps of Nashua and Manchester showing the ward boundaries as adjusted after the 2000 census and certified copies of the Nashua and Manchester city charters as amended to reflect the ward boundaries changed after the 2000 census. The new ward boundaries differ from the ward boundaries used by the court in establishing a new district plan for the New Hampshire Senate. The Senate President asks, among other things, that the court amend the district plan for the Senate by using the current ward lines for Nashua and Manchester.

It is helpful to review the events leading to the filing of this motion. The jurisdiction of this court was invoked in April 2002, when eleven senate Democrats filed a petition for original jurisdiction requesting the court to declare the existing State senate districts unconstitutional and to impose a deadline for the legislature to enact a valid senate redistricting plan. Given the need to establish a redistricting plan consistent with constitutional requisites before the 2002 senate election, we accepted jurisdiction. On May 22, 2002, the senate and the house recessed without enacting a valid senate redistricting plan. On May 23, 2002, the court determined, that since it had no assurance that a redistricting plan would be validly enacted in time for the upcoming election, it must establish a constitutional senate redistricting plan.

The court endeavored to accomplish the task of redistricting the New Hampshire Senate as fairly, efficiently and quickly as possible, given the imminence of the scheduled September primary. It ordered the parties to submit constitutional redistricting proposals by June 6, 2002. To ensure that the apportionment plan for the New Hampshire Senate was based upon the last general census of the inhabitants of the state taken by authority of the United States or of this state, the court ordered that any redistricting plan submitted by the parties use PL 94-171 census data and that it be provided as a census block equivalency file. On June 5, 2002, the Senate filed a motion alleging that following the 2000 census, New Hampshire's cities received census data from the census bureau and proceeded to redraw their city ward lines. The Senate alleged that "it is likely that ward lines drawn by New Hampshire cities may not correspond with the block files requested in the court's order." The court on June 5

issued an order permitting the parties to submit plans based on ward lines drawn as a result of the 2000 federal census. The court specifically noted that it was expressing no opinion as to whether any such plan would satisfy the federal and state constitutional principle of one person/one vote, and invited the parties to address that issue in their pleadings and at oral argument.

The court received the plans submitted by the parties on or before June 6, 2002. The plans submitted by the parties indicated that they were based upon ward boundaries drawn after the 2000 federal census was conducted. None of the plans submitted by the parties identified the ward boundaries changed after the 2000 census was conducted, the location of the new ward boundaries, or the data from which the changed ward boundaries were derived.

Thus, on June 10, 2002, in the companion case of *Petition of Representative Peter Burling & a.*, the court attempted to obtain additional information regarding the changes alleged to have been made by cities to their ward lines by ordering the New Hampshire House of Representatives to provide the court, in written and electronic form, the block equivalency files showing ward changes made by any city based upon the 2000 federal census figures. The House of Representatives responded that it was unable to comply with this request before oral argument on June 11, 2002.

Oral arguments in both this case and *Petition of Representative Peter Burling & a.* were held on June 11. At oral argument, the court stated that "we need the [census] block equivalency files to show what census blocks were shifted from ward to ward . . . in order for us to construct a plan. . . . We just have to know what pieces of the census data have been changed as a result of these ward changes" and asked who had this information. During a recess, the Clerk of Court asked counsel for the Secretary of State to provide the court with information about any ward boundary changes made after the 2000 census was conducted and, specifically, to identify the census blocks affected by the ward boundary changes. Counsel for the Secretary of State said that the Secretary of State did not have this information.

During oral argument in the companion case, counsel for the House of Representatives informed the court that "only one city . . . uses census blocks [to change its ward boundaries], and that's Dover." Counsel further informed the court that while the cities of Manchester and Nashua had both changed their ward boundaries after the 2000 census was conducted, neither city used census block data to make these changes; both cities "used streets" to make changes to their ward boundaries.

Because our State Constitution requires that any apportionment plan be based upon the last federal decennial census, *see* N.H. CONST. pt. II, arts. 9, 11, 26, the court then informed the parties that "in the absence of the data, hearing that most of the cities haven't used the census data, and to expedite the process we're in, we're going to have to rely upon the unadjusted PL 94-171 census data for those wards."

After oral argument, no party provided the court with the requisite data. On June 24, 2002, the court issued its district plan for the Senate. The plan relied upon the unadjusted PL 94-171 census data for the entire State, including those cities that adjusted their ward boundaries after the 2000 census was conducted. The court ordered that the filing period for candidates for the Senate would run from June 26 to July 5, 2002.

In their response to the Senate President's motion, the petitioners disputed the accuracy of the population figures for the new wards provided in the affidavit of the Nashua city clerk. The court determined that in both Nashua and Manchester, there appeared to be discrepancies between the populations of the wards reconfigured after the 2000 census, as reported by the city clerks in their affidavits and as reported in the federal census data. The discrepancies in Manchester were relatively minor; however, in Nashua, the discrepancies were substantial and in both wards 7 and 8 exceeded 2,000 people.

By order dated July 5, 2002, the court set forth a list showing what it believed were the populations for the newly-configured wards by census block. The court ordered that if any party did not agree that the federal census data figures as set forth on the list were accurate, that party should state the party's reasons for disagreement in a pleading to be submitted by July 9, 2002. The parties agreed that several of the figures in the Nashua city clerk's affidavit that was filed with the Senate President's motion to reconsider were erroneous; several of the parties filed a new affidavit from the Nashua city clerk agreeing that the court's figures, which are set forth below, are accurate:

## NASHUA

Ward 1: The population reported in the federal census data for ward 1 as currently configured is 9,551.

Ward 2: The population reported in the federal census data for ward 2 as currently configured is 9,704.

Ward 3: The population reported in the federal census data for ward 3 as currently configured is 9,698.

Ward 4: The population reported in the federal census data for ward 4 as currently configured is 9,943.

Ward 5: The population reported in the federal census data for ward 5 as currently configured is 9,625.

Ward 6: The population reported in the federal census data for ward 6 as currently configured is 9,252.

Ward 7: The population reported in the federal census data for ward 7 as currently configured is 7,438.

Ward 8: The population reported in the federal census data for ward 8 as currently configured is 11,816.

Ward 9: The population reported in the federal census data for ward 9 as currently configured is 9,578.

With respect to Manchester, the Senate President, the Senate, and the Secretary of State disagreed with the populations for wards 5, 6, 7, 8 and 9 listed in the court's July 5 order. They provided a memorandum from the Office of the City Clerk of the City of Manchester (memorandum) explaining the discrepancies in certain wards. A review of the parties' responses reveals that the following discrepancies remain.

## *MANCHESTER*

Ward 1: The population reported in the federal census data for ward 1 as currently configured is 9,033.

Ward 2: The population reported in the federal census data for ward 2 as currently configured is 9,073.

Ward 3: The population reported in the federal census data for ward 3 as currently configured is 9,013.

Ward 4: The population reported in the federal census data for ward 4 as currently configured is 8,900.

Ward 5: The population reported in the federal census data for ward 5 as currently configured is 9,070. The memorandum indicates that this figure should be 9,072.

Ward 6: The population reported in the federal census data for ward 6 as currently configured is 8,978. The memorandum indicates that this figure should be 9,008.

Ward 7: The population reported in the federal census data for ward 7 as currently configured is 9,070. The memorandum indicates that this figure should be 9,052.

Ward 8: The population reported in the federal census data for ward 8 as currently configured is 8,921.

Ward 9: The population reported in the federal census data for ward 9 as currently configured is 8,846.

Ward 10: The population reported in the federal census data for ward 10 as currently configured is 8,715.

Ward 11: The population reported in the federal census data for ward 11 as currently configured is 8,708.

Ward 12: The population reported in the federal census data for ward 12 as currently configured is 8,679.

Thus, it appears that the court has finally been provided with sufficient corrected information to enable it to consider the new ward lines adopted by the cities of Nashua and Manchester. At this late date, given that the court has already issued a district plan upon which citizens may have relied, and that the filing period for candidates for the senate has expired, the court will not undertake a wholesale revision of the plan it issued on June 24. In order to ensure that its plan complies with the State constitutional requirement that senate districts not divide any city ward, however, the court grants the Senate President's motion in part. *See* N.H. CONST. pt. II. art. 26.

Manchester wards 5, 6, and 7, which are the only wards the populations of which are still in question, are all located in the court plan in Senate District 18. The difference between these totals is *de minimis*, and the discrepancies among the three wards are irrelevant in this proceeding if all three wards remain in the same Senate District. Thus, we need not and do not decide in this proceeding which numbers are accurate. Accordingly, in this proceeding we will continue to use the population reported in the federal census data for Manchester wards 5, 6 and 7 as set forth above.

The court's district plan shall be amended to use the current ward boundaries for the cities of Nashua and Manchester as set forth in the certified copies of the Nashua and Manchester city charters amended to reflect the ward boundaries changed after the 2000 census. Senate District 12 shall be amended to consist of New Ipswich, Mason, Brookline, Hollis, and Nashua wards 1, 2, 3 and 7; Senate District 13 shall be amended to consist of Nashua wards 4, 5, 6, 8 and 9. The remaining Senate Districts shall be unchanged from our opinion dated June 24, 2002. As so amended, the court's plan has an overall range of deviation of 5.46%, and, thus, satisfies the one person/one vote standard.

In addition, the amended plan furthers the court's goal of imposing the least change for New Hampshire citizens in that it changes the senate districts for even fewer people than the court's June 24 plan. The amended plan changes the senate districts for only 16% of the State's population (197,689 people). The reason for this improvement is that fewer wards in Nashua are changed to different senate districts in the amended plan.

The Senate President asserts that the Nashua City Clerk has indicated that Nashua is likely to adjust its ward boundaries in the future. The Senate President contends that if the city does so, this may greatly

increase the total deviation of Senate Districts 12 and 13. Senate Districts 12 and 13 are today drawn using the current ward boundaries adopted by, and in place in, the City of Nashua. The boundaries of Senate Districts 12 and 13 are hereby fixed, and will not be affected if the city adjusts its ward boundaries in the future. Should the city choose to adjust its ward boundaries in such a way that they no longer coincide with the boundaries between senate districts, then it will be the responsibility of the appropriate officials to make internal election process accommodations.

The filing period provided in RSA 655:14, for purposes of the 2002 senatorial election, shall be extended until July 18, 2002, only for candidates in those Senate Districts affected by this order (Senate Districts 12, 13, 16, 18 and 20).

The slip opinion issued on June 24, 2002, is modified by deleting the Index to Appendices and the appendices themselves, and by replacing them with the following Index to Appendices and the appendices attached to this order.*

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.

[The following orders were issued by the supreme
court in *Below v. Secretary of State*; they are reprinted
here to provide context for the court's opinion.]

### Order Dated May 3, 2002

In the response of the Attorney General regarding the constitutionality of existing State senate districts, filed this date, the Attorney General has set forth his opinion that the existing senate districts are not consistent with constitutional requirements. This court will not permit upcoming elections to go forward with unconstitutional districts.

In light of the Attorney General's response, we conclude that we need not order briefing and oral argument pursuant to the schedule set forth in our order dated April 26, 2002.

Because the June 5th filing date is imminent, the court will issue appropriate orders on or after Friday, May 17, 2002, at 12:00 noon, unless a senate reapportionment plan has become law by that time. *See Monier v. Gallen*, 122 N.H. 474, 476 (1982).

Brock, C.J., and Nadeau, Dalianis and Duggan, JJ., concurred.

---

*Note: The replacement Appendices A, B, and C are set out above.

### Order Dated May 17, 2002

The parties having failed to notify the court by 12:00 noon today that a senate reapportionment plan has become law, it is hereby ordered that the statutory filing period for senate candidates is enjoined pending further order of the court. *See* RSA 655:14.

Based upon pleadings filed and representations made, the court has determined that May 22, 2002, is the last date by which the court will have assurance that a senate reapportionment plan will be validly enacted in time for the upcoming election. *See Wilson v. Eu*, 823 P.2d 545, 547 (Cal. 1992).

In order to guarantee that the citizens of New Hampshire have the opportunity to vote for senators in a constitutional election, the court will issue an order on or after May 23, 2002, outlining the process and schedule by which the court will establish a constitutional senate reapportionment plan.

The parties should be mindful that the United States Supreme Court has said that when a court is compelled to resolve a legislative impasse and adopt a reapportionment plan for the citizens, the court-ordered plan "must ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Chapman v. Meier*, 420 U.S. 1, 26-27 (1975); *see Colleton County Council, et al. v. Glenn F. McConnell, et al.*, No. 01-3581-10 (D.S.C. Mar. 20, 2002) (interpreting de minimus variation as plus or minus one percent).

Several motions, including motions to intervene and to appear as *amicus curiae*, are pending. We will take no action on these motions at this time.

Brock, C.J., and Nadeau, Dalianis and Duggan, JJ., concurred.

### Order Dated May 24, 2002

The legislature, having recessed without adopting a reapportionment plan for the 2002 elections, has failed to comply with Part II, Article 26 of the New Hampshire Constitution. *See* order dated May 17, 2002. Therefore, in order to guarantee to the people of New Hampshire the "equal right to vote" provided by Part I, Article 11 of the New Hampshire Constitution and equal protection under the Fourteenth Amendment to the United States Constitution, the Court is constitutionally obligated to establish a reapportionment plan for the Senate.

Henceforth, the parties to this case are: the petitioners, the Senate President, the Senate and the Secretary of State. It is the court's intention to permit each party to submit a written proposal for the court's consideration in devising its constitutional reapportionment plan. On

Tuesday, May 28, 2002, the Court shall issue an order setting forth the requirements for written proposals and other materials to be filed with the Court. Proposals must be filed on or before 12:00 Noon on Thursday, June 6, 2002. The court intends, if necessary, to hear oral argument on the parties' proposals on June 11, 2002 at 10:00 a.m. before adopting the final reapportionment plan for the Senate. No request for a continuance will be entertained.

The court's primary consideration in adopting a reapportionment plan is that it satisfy the federal and state constitutional principle of one person/one vote. Accordingly, it intends to adopt a plan that has districts "as nearly equal as may be in population," as provided by Part II, Article 26. It may not be possible to consider other factors such as geographical contiguity, community of interest, or configuration of existing districts, or to give full effect to the constitutional provision relating to the division of towns, wards or places.

If a reapportionment plan is validly enacted before the Court adopts a plan, the court will terminate this proceeding.

The order issued on May 17, 2002 enjoining the June 5, 2002 filing date remains in effect but shall expire automatically if a validly enacted plan is adopted by 12:01 a.m. on June 5, 2002.

The Secretary of State shall inform the court in writing by 12:00 Noon Tuesday, May 28, 2002, of the time that he believes will be required to print and distribute ballots in advance of a 2002 primary election for the purpose of nominating candidates for the Senate.

All non-budgeted costs incurred by the Court associated with this case, including but not limited to, computer program costs and the cost of one or more technical assistants shall be paid by the State Treasurer.

Brock, C.J., Nadeau, Dalianis, and Duggan, JJ., concurred.

### Order Dated May 30, 2002

The court has concluded that it is necessary to appoint a neutral, technical advisor to assist the court in this case. A technical advisor will provide assistance to the court in understanding and utilizing relevant technology and, thus, enable the court to fulfill, on an expedited basis, its constitutional responsibility to establish a reapportionment plan for the Senate.

The court proposes to issue an order appointing Mr. Bobby Bowers, Director of the South Carolina Budget and Control Board Office of Research and Statistics, as its technical advisor in this case. Mr. Bowers has served in the capacity as a technical advisor to the United States District Court for South Carolina in redistricting litigation and has

extensive experience in this area. *See Colleton County Council, et al. v. Glenn F. McConnell, et al.*, No. 01-3581-10 (D.S.C. Mar. 20, 2002); *Burton v. Sheheen*, 793 F. Supp. 1329, 1339 (D.S.C. 1992), *vacated sub nom., Statewide Reapportionment Advisory Committee v. Theodore*, 508 U.S. 968 (1993). Mr. Bowers' business address is Suite 425, Rembert C. Dennis Building, 1000 Assembly Street, Columbia, South Carolina 29201. A copy of Mr. Bowers' curriculum vitae is attached to this order.

In his capacity as technical advisor, Mr. Bowers may be called upon to assist the court in educating itself in the technical language of redistricting and mapping and in the technology employed by the parties and their technical experts; to act as a liaison, if necessary, between the court and the parties' technical experts to achieve an acceptable computer format; and to assist the court in understanding and analyzing the proposed redistricting plans which are expected to be submitted by the parties. Mr. Bowers will advise the court *in camera*, as requested, concerning any technical matters. To the extent necessary for resolution of this matter, Mr. Bowers may also be called upon to assist in drawing a redistricting plan for the court, but only in accordance with the directives of the court.

Courts have inherent authority to appoint technical advisors in rare cases in which outside technical expertise would be helpful. *See Reilly v. United States*, 863 F.2d 149, 156 (1st Cir. 1988). "[S]uch appointments should be the exception and not the rule, and should be reserved for truly extraordinary cases where the introduction of outside skills and expertise, not possessed by the judge, will hasten the just adjudication of a dispute without dislodging the delicate balance of the juristic role." *Id.* *See generally State v. Coon*, 974 P.2d 386, 395-96 (Alaska 1999) (discussing authority of courts to appoint expert technical advisors).

Throughout this proceeding, Mr. Bowers will act as a sounding board for the court's assessment of the plans submitted by the parties and will function as a confidential advisor to the court analogous to the role performed by the court's judicial clerks. He will be appointed only as a technical advisor to the court pursuant to the inherent authority of the court, *see Reilly*, 863 F.2d 149; he will not be appointed as an expert. Mr. Bowers will not be called upon to testify. He will not act as a finder of fact, nor will he attempt to advise the court on any matter of law. Neither he nor staff members acting at his direction may be subjected to cross-examination, and all confidential computer and other confidential files of Mr. Bowers and his staff prepared in connection with this case, like those of the court, shall be protected from demands for production or disclosure.

ACCORDINGLY, THE PARTIES ARE HEREBY NOTIFIED that the court intends to appoint Mr. Bobby Bowers, Director of the South Carolina Budget and Control Board Office of Research and Statistics, as

its technical advisor in this case. If any party objects to the appointment of Mr. Bowers as technical advisor, that party shall file a written objection, setting forth the specific grounds for the party's objection, on or before June 5, 2002.

Brock, C.J., and Nadeau, Dalianis, and Duggan, JJ., concurred.

## Order Dated June 7, 2002

By order dated May 30, 2002, this court notified the parties of its intent to appoint Mr. Bobby Bowers, Director of the South Carolina Budget and Control Board Office of Research and Statistics, as its technical advisor in this case to assist the court in understanding and utilizing relevant technology to enable the court to fulfill on an expedited basis its constitutional responsibility to establish a reapportionment plan for the Senate. It did so due to its firm conviction that this case is an "extraordinary [one] where the introduction of outside skills and expertise, not possessed by the judge, will hasten the just adjudication of a dispute without dislodging the delicate balance of the juristic role." *Reilly v. United States*, 863 F.2d 149, 156 (1st Cir. 1988). Mr. Bowers served as a technical advisor to the United States District Court for the District of South Carolina in a number of redistricting cases, *see Colleton County Council, et al v. Glenn F. McConnell, et al.*, No. 01-3581-10 (D.S.C. Mar. 20, 2002); *Burton v. Sheheen*, 793 F. Supp. 1329, 1339 (D.S.C. 1992), *vacated sub nom., State Reapportionment Advisory Committee v. Theodore*, 508 U.S. 968 (1993), and he has extensive experience in this area.

The parties were ordered to advise the court in writing of any objections to the proposed appointment of Mr. Bowers, and the reasons therefore on or before June 5, 2002. After review of the objection filed by Senate President Arthur P. Klemm, the court overrules it.

ACCORDINGLY, the court hereby appoints Mr. Bobby Bowers, Director of the South Carolina Budget and Control Board Office of Research and Statistics, as its technical advisor in this cases. In his capacity as the court's technical advisor, Mr. Bowers will be called upon to assist the court in educating itself in the technical language of redistricting and mapping and in the technology employed by the parties and their technical experts; to act as a liaison, if necessary, between the court and the parties' technical experts; and to assist the court in understanding and analyzing the proposed redistricting plans submitted by the parties.

Mr. Bowers will advise the court *in camera*, as requested, concerning any technical matters. To the extent necessary for resolution of this matter, Mr. Bowers may also be called upon to assist in drawing a

redistricting plan for the court, but only in accordance with the directives of the court.

Throughout this litigation, Mr. Bowers will act as a sounding board for the court's assessment of the plans submitted by the parties and will function as a confidential advisor to the court analogous to the role performed by the court's judicial clerks. He is appointed only as a technical advisor to the court pursuant to the inherent discretion of the court, *see Reilly*, 863 F.2d 149; he is not appointed as an expert. He will not act as a finder of fact, nor will he attempt to advise the court on any matter of law. Neither he nor staff members acting at his direction may be subjected to cross-examination, and all confidential computer and other confidential files of Mr. Bowers and his staff prepared in connection with this case, like those of the court, shall be protected from demands for production or disclosure.

Brock, C.J., and Nadeau, Dalianis and Duggan, JJ., concurred.

### Order Dated June 7, 2002

For well over a year, the general court has been unable to enact a redistricting plan for the Senate that satisfies the constitutional guarantee of an "equal right to vote" provided by Part I, Article 11 of the New Hampshire Constitution and equal protection under the Fourteenth Amendment to the United States Constitution. Accordingly, the court finds itself faced with the responsibility of developing a redistricting plan that satisfies these constitutional mandates. It is imperative that this complex task, which requires technical knowledge and skill, be completed in an extremely expedited manner because of the time requirements for the scheduling of a primary election. As a result, the court has incurred and will continue to incur unanticipated expenses that were not provided for in its budget, including the expense of technical advisors to assist the court.

These are expenses incurred to benefit the citizens of the State and it was the court's intention by its order of May 23, 2002, to inform the parties of its expectation that the State would be responsible for their payment. On May 31, 2002, the State Treasurer filed a motion to clarify and the Governor, Senate and House of Representatives filed a joint request to modify the court's May 23, 2002 order. The court requests the parties to

file memoranda and address at oral argument the issue of how these unanticipated expenses should be paid.

Brock, C.J., Nadeau, Dalianis and Duggan, JJ., concurred.

### Order Dated June 24, 2002

The Senate president has requested the court to shorten the Senate filing period from the ten days required by RSA 655:14 to four days. In view of the geographical changes in the redistricting plan, it is unreasonable to expect potential candidates to absorb the information and make a decision whether to seek office or, for instance, to procure and file the requisite number of primary petitions in lieu of a filing fee under RSA 655:20, within four days. Accordingly, the filing period which RSA 655:14 provides as ". . . between the first Wednesday in June and the Friday of the following week," shall, for purposes of a 2002 senatorial election, be between the fourth Wednesday in June and the Friday of the following week. It is not the intent of this order or of the court's opinion to otherwise alter the provisions of RSA 655. The legislative and executive branches are free to take whatever subsequent steps may be necessary to assure that a 2002 Senate election is held.

The motion to set new election deadlines is otherwise denied.

Brock, C.J., and Nadeau and Dalianis, JJ., concurred.

### Order Dated September 23, 2002

On May 23, 2002, the court issued orders in the above captioned cases requiring that "All non-budgeted costs incurred by the Court associated with this case, including but not limited to, computer program costs and the cost of one or more technical assistants shall be paid by the State Treasurer." On May 28, the Commissioner of the Department of Treasury, through the Attorney General's Office, filed a Motion to Clarify this order. A Joint Memorandum in Support of the State Treasurer's Motion for Clarification and Joint Request for Modification of the Court's order of May 23, 2002 was filed by the Governor, Senate and House of Representatives. On May 30, the Court issued an order indicating its intention to appoint Bobby Bowers as its technical advisor and affording all parties an opportunity to object to the appointment. Only the Senate President filed an objection. On June 7, the Court issued orders in these cases appointing Bobby Bowers as its technical assistant.

That same day the Court issued a clarification and modification of the May 23 order. In the order the court indicated that it found itself faced with the responsibility of developing redistricting plans that satisfied the constitutional mandate. It advised the parties that the court would

continue to incur unanticipated expenses that were not provided for in its budget, including the expense of technical advisors to assist the court. The order provided in part:

> These are expenses incurred to benefit the citizens of the State and it was the court's intention by its order of May 23, 2002, to inform the parties of its expectation that the State would be responsible for their payment. . . . The court requests the parties to file memoranda and address at oral argument the issue of how these unanticipated expenses should be paid.

Oral argument in both cases was held four days later. The issue of payment of the expenses for the technical advisors was addressed briefly at argument. None of the parties, however, filed memoranda requested by the June 7 order.

At this point, the bill for the technical advisors has been received, but has not been paid. Various alternatives may be available for its payment, including whether the bill is chargeable to one or more of the parties in these cases.

The Court has concluded it would be useful for counsel for the parties in these cases to meet with the clerk to discuss how this bill will be paid and whether this matter can be resolved without further briefing, argument or court order. A conference with the clerk has been scheduled for Monday, October 7, 2002, at 9:30 a.m. at the Supreme Court. Counsel for all parties shall attend.

Brock, C.J., and Nadeau, Dalianis, and Duggan, JJ., concurred.

### Order dated October 9, 2002

During the course of these cases, the issue arose of how unanticipated expenses related to these cases would be paid, and who was responsible for payment. The court first addressed the issue in its orders of May 23, 2002, which stated in part: "All non-budgeted costs incurred by the Court associated with this case, including but not limited to, computer program costs and the cost of one or more technical assistants shall be paid by the State Treasurer."

On May 28, the Commissioner of the Department of Treasury, through the Attorney General's Office, filed a Motion to Clarify these orders. A Joint Memorandum in Support of the State Treasurer's Motion for Clarification and Joint Request for Modification of the Court's order of May 23, 2002, was filed by the Governor, Senate and House of Representatives.

On May 30, the Court issued orders indicating its intention to appoint Bobby Bowers as its technical advisor, and on June 7, it issued orders doing so.

On June 7, the court also issued orders clarifying and modifying its May 23 orders relating to these expenses. Noting that it would continue to incur unanticipated and unbudgeted expenses in fulfilling its responsibility to develop redistricting plans for the House and the Senate, the court stated:

> These are expenses incurred to benefit the citizens of the State and it was the court's intention by its order of May 23, 2002, to inform the parties of its expectation that the State would be responsible for their payment. . . . The court requests the parties to file memoranda and address at oral argument the issue of how these unanticipated expenses should be paid.

None of the parties filed the requested memoranda. Oral argument in both cases was held four days later. The issue of payment of the court's expenses was addressed by some of the parties at argument. When asked about payment of the court's expenses related to the redistricting cases, counsel for the Senate President stated:

> [P]resident Klemm wanted you to know that he has worked successfully with the court on the question of the legislative audit and the additional funding for the district courts and has no reason to believe we couldn't resolve this. . . . We have to meet with other people in State Government to do that. *But he's optimistic that we can come up with something that will work for all three branches.* (Emphasis added.)

When asked about payment of the court's expenses, counsel for the House of Representatives stated:

> I think I have an answer similar to [counsel for the Senate President]. We received that late and we're more than willing to talk about it. We also think that the Governor's an appropriate party to be involved in that discussion. *But that we're more than willing to discuss it and to come to some sort of agreement.* (Emphasis added.)

The court received the bill of the technical advisor hired by the court for services rendered in these cases. A copy of the bill has been provided to the parties in these cases. The bill also was sent to the General Court Fiscal Committee, which indicated that it had no authority to pay the bill.

By order dated September 23, 2002, the court ordered that a structuring conference be held by the clerk of court "to discuss how this bill will be

paid and whether this matter can be resolved without further briefing, argument or court order." The structuring conference took place on October 7, 2002, but no agreement was reached by the parties about payment of this bill.

Accordingly, on or before 12:00 noon, October 18, 2002, the petitioners in each case, the House of Representatives, the Senate, the Speaker of the House, and the President of the Senate shall file memoranda addressing the following issues: (1) which party or parties will be responsible for payment of the bill for services of the technical advisor; and (2) the amount which a responsible party shall pay. A hearing on these issues will be held at 10:30 a.m. on October 23, 2002, in 2002-0243, *Petition of Senator Clifton Below*, and at 11:00 a.m. on October 23, 2002, in 2002-0210, *Petition of Representative Peter Burling & a.* It is not necessary for the State Treasurer or the Secretary of State to file a memorandum or attend the hearing.

Brock, C.J., and Nadeau, Dalianis, and Duggan, JJ., concurred.

### Order dated October 29, 2002

At the October 23rd argument, all parties agreed that the court has the inherent power to engage the services of a technical advisor. The parties also agreed that the expense for the technical advisor is one the State of New Hampshire must pay and that if the advisor were forced to bring suit on the contract to recover his fees, the State would be obligated to pay any judgment.

At argument, the court was informed that the advisor's bill can be paid from the following funds: $1,976,000 currently at the disposal of the Senate; $3,601,000 currently at the disposal of the House; and $1,125,000, of which $236,276 is a specific line item for "consultants," currently at the disposal of the Joint Facilities Committee. The court was also informed that the Speaker of the House, the Senate President or the Joint Facilities Committee can authorize payment from these funds without additional action by the legislature.

Accordingly, the court will defer taking any further action in this case for a period of 14 days. The court requests that counsel provide the attached transcript of the October 23rd oral arguments to the House and Senate leadership and members of the Joint Facilities Committee. It is the court's hope that the elected representatives of the people will decide that voluntary payment of the bill from the accounts described above serves a legitimate purpose which advances the best interest of the people and the government.

Brock, C.J., and Nadeau, Dalianis, and Duggan, JJ., concurred.

TRANSCRIPT OF THE ARGUMENTS BEFORE THE NEW
HAMPSHIRE SUPREME COURT ON OCTOBER 23, 2002

APPEARANCES: John P. Kacavas, Esq.
for the petitioners in Case No. 2002-0243

Richard J. Lehmann, Esq.
for the New Hampshire Senate

Charles G. Douglas, III, Esq.
for the President of the New Hampshire Senate

Michael D. Hatem, Esq.
for the petitioners in Case No. 2002-0210

Representative Peter H. Burling

Betsy B. Miller, Esq.
for the New Hampshire House of
Representatives

Christopher H.M. Carter, Esq.
for the Speaker of the New Hampshire House of
Representatives

CHIEF JUSTICE BROCK: The matter is before the court this
morning on the petition of Below (#2002-0243) and the petition of Burling
(#2002-0210). Mr. Kacavas.

ATTORNEY KACAVAS: Thank you, Your Honor. Good morning, Your
Honors. May it please the court, my name is John Kacavas and I appear on
behalf of the petitioners to reiterate the position that we took when we
were last here at the oral argument on the redistricting matter and that
position is that because the legislature abdicated its responsibility to
constitutionally enact valid legislative districts, the legislature bears
responsibility for paying the costs and fees incurred by the court in
standing in the legislature's stead. Before I go any further, Your Honor,
because both these arguments for all intents and purposes are one
consolidated argument, because the petitioner on the Senate case, the
position of the petitioners in the Senate in entirely consonant with the
position of the petitioners in the House matter and Representative Peter
Burling, the named petitioner in the House matter, is here with me today.
Representative Burling has the most up-to-date, as of this morning,
information regarding the legislative accounts from which these costs and
fees could be paid. I would ask the court in the interest in putting the cart
before the horse to — for leave to yield a portion of my time so that

Representative Burling can inform the court about his findings about the legislative accounts. I have made my proposal to opposing counsel who objects, for the court's information.

CHIEF JUSTICE BROCK: All right. May we hear the basis of the objection?

ATTORNEY LEHMANN: Yes, Your Honor. The basis of the objection is simply that we came here this morning not prepared to discuss in any detail the workings of the legislative budget process. We're — this is a complete surprise to us and additionally Representative Burling is not a party to this case, in either event. I agree that the issues are fundamentally the same, but that's the basis of our objection.

CHIEF JUSTICE BROCK: Well, didn't the parties — the Senate and the House file a joint memorandum in these cases?

ATTORNEY LEHMANN: That's correct. Yes.

CHIEF JUSTICE BROCK: So I think that there is a recognition that these cases overlap.

ATTORNEY LEHMANN: Absolutely, I don't contest that that's the case.

CHIEF JUSTICE BROCK: And you're saying that you didn't understand that one of the purposes of this hearing was for us to inquire as to how this bill could be paid.

(PAUSE)

ATTORNEY LEHMANN: Well, my understanding is that the court's order was to answer the question, "Which party will pay it?" Not, what the — where the money could be found if we looked in every possible location. The legislature's not here saying that we're — its not able to pay the bill if the court issues an order, the money exists, that's not the issue.

(PAUSE)

CHIEF JUSTICE BROCK: All right, do you wish to be heard Mr. Kacavas?

ATTORNEY KACAVAS: I do, Your Honor. First of all, Your Honor, Representative Burling is a party in this matter, he's the named petitioner in this matter and as counsel just conceded these matters overlap and on the issue of payment, they are identical. We are here to present the court with an argument and reasoning as to why we believe the legislature should bear the responsibility to pay the costs for the court's technical

advisor. In order to do that we need to establish for the court where these funds are coming from, how much is available and other funds that have been paid on behalf of legal counsel to the respondents in this matter. And, I think it's important for the court to kind of set the table and then permit us to argue. And, that's why I ask that the court permit Representative Burling to provide the court with some information that I think will inform the rest of our discussion.

CHIEF JUSTICE BROCK: Mr. Douglas would you like to be heard?

ATTORNEY DOUGLAS: Well, I would object too, Your Honor. What is going to happen is something that should have — be in front of a master. You're going to hear a lot of line item discussion of the details of the budgeting. I see from the handouts that they've given us, pages of numbers and I'm just not sure this court is the appropriate place to fact find on what line items are where. Mr. Burling is in the legislature, but we don't have folks here from the LBA's office or the legislative facilities office to respond to line item issues. I thought we were here, like in most Supreme Court arguments, on legal arguments, constitutional arguments. Now it's going to turn out that if the money is in line 43 under this code you can move it here. All that maybe true, in a cosmic sense, but it still doesn't answer the question of who should pay and who's responsible. So, we just object to that process. If John wants to make his legal argument and our team, ours, fine. And, if the court afterwards says well, this does require somebody to just take an afternoon and haul the right people in to figure out these line items that's fine. But, frankly, to be given this this morning, it was not provided previously, memos — there was a deadline — memos were provided. This morning, we're handed a series of numbers and legislative codes. I think that's improper. That's not how I've ever argued a case before.

CHIEF JUSTICE BROCK: All right, Mr. Kacavas, are you representing to the court that the information that Mr. Burling would give us in a preliminary manner is consistent with the affidavit that he filed and would be helpful to the court's ultimate resolution of this matter?

ATTORNEY KACAVAS: I am, Your Honor, and in addition to that, in response to Attorney Douglas' comment, our position on this issue is no surprise. We took this position at the oral argument on the substantive issue of redistricting, we've taken this position in filing our memorandum last week. Our position in this case is no surprise. What we are here to do is to inform the court, provide the court with information and that is exactly what we propose to do, Your Honor.

CHIEF JUSTICE BROCK: All right, we're going to grant the motion. But, if it becomes necessary for the House or the Senate to present additional information to the court, we will consider giving them that opportunity to do that this afternoon.

ATTORNEY KACAVAS: And we certainly would have no objection to that Your Honor.

CHIEF JUSTICE BROCK: All right, we're going to allow Mr. Burling to make his presentation and we'd like to start the clock fresh at this point.

REP. PETER BURLING: Thank you, Your Honors. For the record, my name is Peter Hoe Burling. I represent the towns of Cornish and Plainfield and I'm the Democratic leader of the New Hampshire House. I'll move very quickly through the points I wanted to make. I'm here, I hope, to assist the court in understanding the current status of events. I stood here before this honorable bench on May 23rd and at the conclusion of some remarks, if I remember correctly, being made by Representative John Pratt, I was asked by one of the Justices what my position was as the Democratic leader relative to paying the bills incident to a redistricting case. I stood here and said that it was my position that these were legislative obligations and that the costs should be borne by the legislature. I remember the same question being directed to counsel on my left and, I want to be very clear, I do not remember that any objection was raised at the time by House counsel. I'm informed that Senate counsel had filed a written objection. But, I do clearly remember the statement being made to the bench, "I'm sure we can work this out, Your Honors." That's the last I heard of the whole issue. And, I should say that I understood that the court would hire experts and would proceed to incur expenses in the redistricting matter, if the legislature was unable to pass a constitutional plan. The next thing that happens, following the issuance of the court's order, is a finance — excuse me — a fiscal committee meeting of the legislature on the 31st of July. I mention this just by context. At that meeting, the legislative — joint legislative fiscal committee approved the payment of a large number of redistricting costs. Included in the redistricting costs, though not specified on the 31st, were legal fees for the Senate President's counsel and the House Speaker's counsel.

CHIEF JUSTICE BROCK: May I interrupt. Did you say the fiscal committee approved this?

REP. BURLING: Joint Legislative Fiscal Committee approved this.

CHIEF JUSTICE BROCK: All right.

REP. BURLING: I'm not a member of that committee, so I wasn't present. But, I learned subsequently from the Democrat who was present that this had happened. I also learned that she had asked for a specification of charges included in that July 31st vote and that specification of charges was provided by Michael L. Buckley, CPA. He's the legislative budget authority. That was provided to us on September 9, 2002, and I have a copy for Your Honors should you deem it to be appropriate and helpful.

CHIEF JUSTICE BROCK: We would like you to leave a copy with the stenographer.

REP. BURLING: I'd be happy to do so, Your Honor. The question about paying for the necessary costs incurred by the court obviously became an issue in September and I would simply like to say that my position and that of my caucus remains the same. We believe this is a legislative obligation. More specifically, as I said in my affidavit, we believe that it is perfectly appropriate for the court to apportion the expense on the basis of the work that Mr. Bowers said he did. I have no reason to disbelieve and I do not disbelieve his allocation of hours between the Senate and the House. And, for my part and my caucus, I would say to the court, I think it's entirely appropriate for the House to be charged proportionate to the hours incurred. The final thing I would like to do is I would say simply that as a legislator and a citizen of the U — State of New Hampshire, I'm entitled to review public documents relative to legislative accounts. I did so this morning and I would simply like to say, and again I have a copy of this for the court, that under the line item Joint Legislative Account — Consultants, that is, the number becomes apparent, but it's 1160 Subsection 046, there is a current balance in the possession of the Joint Legislative Body of $236,276.37. I would represent to the court that on the basis of what I've heard that is more than sufficient to cover the ordinary and necessary expenses incurred by Mr. Bowers doing what was a legislative function on behalf of the court. Finally, I would simply like to say as Democratic leader that I believe that this matter falls clearly within the power of the court to order payment and while I am painfully aware of the constraints this is placing upon the court you will have my support, for what its worth, if you issue an order directing payment and I would like to say as a legislator that I am ashamed and saddened that the chance should be taken to place the court between a rock and a hard place on this issue. We all knew when we came here that we were here because we could not politically resolve the most difficult of problems and even though there were parts of the redistricting order that made me sit down hard on the

concrete, I knew at every stage of this process that it was a legislative obligation and that we owed the duty to pay. Thank you for your attention.

JUSTICE DUGGAN: May I ask a question. The line that you mentioned, Joint Legislative Accounts line, who is — under what process is that spent? Is that the Joint Legislative Fiscal Committee can authorize expenditures from that line?

REP. BURLING: Well, under my understanding of House Rules and Joint Rules, we don't currently have a joint rules, but traditions, lets put it that way, both the Legis — Joint Facilities Committee and the Joint Fiscal Committee should meet to approve these. But —

JUSTICE DUGGAN: But, the approv — I'm sorry go ahead.

REP. BURLING: But, the approval would be by the committee and in ordinary course of things, we would meet and we would say we've got a bill to pay, we'd all say yes and the bill would get paid out of the appropriate account.

JUSTICE DUGGAN: So, those two committees are authorized by whatever process to pay out of that line without any other legislative or executive action.

REP. BURLING: That's my understanding. And, Your Honor I want to be very clear, at the start of the process of redistricting we did, in fact, appropriate a sum of money. That sum of money was to cover the costs, which we knew would be incurred in the redistricting process. When the re — when the majority party in joint fiscal decided to pay the legal bills on their side of the fight they did so without enough money in the account. So, they brought in money from other accounts to the redistricting accounts to cover their costs. That becomes apparent when you review this other document I'll make available to you. And that is, the definition by Mr. Buckley of what happened regarding redistricting expenses. So, they brought in $20,000 additional dollars to that account so they could cover the cost of their own counsel. There is, at least according to this record, a continuing balance in that account, but not enough to cover the $80,000 expenditure. The point is, it would take next to nothing in terms of legislative effort to get the money in the right place to pay the bill.

CHIEF JUSTICE BROCK: Are — is it required under the rules that there be a meeting of these two committees in order to approve transfers in these accounts and expenditures?

REP. BURLING: That has always been the rule.

CHIEF JUSTICE BROCK: And, do you know at this point whether there are minutes of these meetings?

REP. BURLING: The only things I have are the September 9, 2002 letter from Mr. Buckley, which detailed all of the items in the redistricting expense, which was paid on the 31st of July. And, in addition to that, I have this document, which is part of a regular monthly statement to the Joint Fiscal Committee of the State's financial situation and in specific the legislature's financial situation. And as I say, I believe these documents are public documents. I just walked down to Mr. Buckley's office this morning and asked for them.

JUSTICE DUGGAN: Can I ask you a couple more questions too? Can you give us a ballpark figure as to how much the legislature has paid out of this account for outside legal fees?

REP. BURLING: I'd be delighted to give you that figure. The specifics, I don't have an adding machine before me — I've got —

JUSTICE DUGGAN: Ballpark figure.

REP. BURLING: Ah, $9,300 to McLane; Douglas, Leonard and Garvey $15,000; Hinckley Allen $18,000. Those are the three payments out. The total of that would be 30, ah, 40 something.

ATTORNEY KACAVAS: 42.

JUSTICE DUGGAN: One other question. What other kinds of expenses associated with the redistricting process came out of these accounts besides legal fees, can you just characterize them in a general way?

REP. BURLING: Yes. All of the rest of the material in this list of debits from the account is very traditional redistricting stuff. The first two items, Caliper Corporation. We bought software for both sides. So, we paid Caliper Corporation both for the software application itself and the licenses to use it. And then, training, tuition because we sent House staffers to learn how to run the programs.

JUSTICE DUGGAN: That's the kind of software you use for the redistricting to figure out the votes.

REP. BURLING: That's exactly right, Your Honor. There are three items from my Chief of Staff Mr. Todd Quinn. He went to — this is a travel expense. He went to Newton, Mass to cover training. You'll see a large number here — these are just travel expenses. The House decided that it would put on a road show and it would take its redistricting plans to each of the counties. And, what you see are reimbursements of staffers and

reps. from both sides of the aisle going to these various items. But, but these expenditures are all in the nature of $30, $20, $40 for mileage.

CHIEF JUSTICE BROCK: Approximately, how much was expended for consulting and software?

REP. BURLING: Well Caliper was nearly $8,000, travel expenses look like a couple of thousand maximum. We started with $45,000 — that was the appropriation we passed for ourselves to do this. We had $22,000 left by the time we got to paying legal fees for the majority party. The other thing I would just, if I may Your Honor since you asked the question. In summary, the Senate has available to it as of today approximately $1,976,000. The House has available to it $3,601,000 and the Joint House and Senate have available to them $1,125,000. But again, since we have a joint item for consultants with more than $200,000 in the account, it seems to me we have plenty of funds available. Thank you, Your Honors.

CHIEF JUSTICE BROCK: Thank you.

ATTORNEY KACAVAS: Thank you, Your Honor. I would simply like to echo all of what Representative Burling said and just add a few additional comments. First of all, Your Honors, while I did have the privilege and the honor of representing petitioners Clifton Below, et. al., the Senate Democrats in this matter, I did have the misfortune of representing the minority party and, therefore, I derive no financial benefit as opposing counsel did from this fiscal committee account.

CHIEF JUSTICE BROCK: Have you considered requesting fees?

ATTORNEY KACAVAS: I have not done that, Your Honor, because I truly believe that this is — this comes first to be quite honest with you. We've got to deal with this first and my fees have been put off 'til later and I'm just trying to represent my clients to the best of my ability and resolve this matter. What I would say to the court regarding payment is that we were forced to come to this court seeking declaratory and injunctive relief. In joining the opening of the filing period for Senate candidates and declaring that the existing Senate Districts were unconstitutional and in granting that relief this court was performing, unquestionably, a judicial function. But, I believe the court's role changed over the course — as this case developed over the course of time. This role — this court's role changed from one of a judicial role to a legislative role. We have from day one taken the position that the legislature constitutionally delegated to redistrict, abdicated its responsibility. Quite to the contrary, the respondents have taken the position that this is a judicial usurpation and that is quite clear at page 9 of their memorandum where they say, "It is

difficult to imagine a more intrusive usurpation of legislative authority than a judicial branch expenditure of funds from an appropriation specifically made to the legislature for legislative purposes." But, that ignores the fact that this court was performing a legislative function, reluctantly albeit. In the case of *Connor v Finch* a 1977 Supreme Court case that was quoted throughout our pleadings in this case and throughout the oral argument, the United States Supreme Court observed that a court is left with the unwelcome obligation of performing in the legislature's stead when the legislature fails to enact constitutionally valid redistricting plan. This court acted in the New Hampshire Legislature's stead, therefore funds appropriated for legislative purposes are properly payable to this court to pay the costs incurred by this court for performing the legislative function. And that's all I would say unless the court has any further questions. Thank you.

CHIEF JUSTICE BROCK: Thank you.

ATTORNEY LEHMANN: My name's Richard Lehmann, I represent the New Hampshire Senate. Good morning. I guess the first thing I have to say is that I have to take issue with my friend Attorney Kacavas' characterization of the legislature abdicating its responsibility in this case. The legislature passed redistricting bills. Those redistricting bills were vetoed. The Governor has constitutional authority to veto that's fine but to then to throw it back at the legislature and say that the legislature somehow failed to perform strikes me as unfair. The petitioners state that they did — they had no choice but to come to this court, that there was absolutely no choice whatsoever but to come here. I submit that's not exactly true, in fact, it's the petitioners in this case who forced the issue, excuse me, by failing to override the Governor's veto.

CHIEF JUSTICE BROCK: Well, is that completely accurate Mr. Lehmann? If nothing happened this session to redistrict so it never became law and so what existed was the old redistricting system, and I assume that's what you would have gone forward with or tried to go forward with, absent something passing this session of the legislature. And their Petition for Declaratory Judgment sought a ruling that the existing system was unconstitutional under both the Federal and State Constitutions. Isn't that true?

ATTY. LEHMANN: Yes and no, I guess I disagree with the proposition that somebody at any point really planned to go forward with the existing plan. It was, clear in 1982 from *Monier v Gallen* that this court was going to step into the breach if one existed and, because of that, there was never any real doubt as to the fact that redistricting would occur was only a

question of how it would be done and I, by suggesting as I did earlier, that there are — there were three specific actions that caused there to be no redistricting plan adopted as law. One by the legislature passing law, one by the Governor vetoing it, and one by the minority party failing to override the veto. I don't quarrel with anybody's decision that they made in that regard.

CHIEF JUSTICE BROCK: How would the election have gone forward absent something that the Governor, the House and the Senate agreed upon?

ATTORNEY LEHMANN: I don't think it would have, I think there would have been a judicially-created redistricting plan. Frankly and I don't, this is not a derogatory statement that I'm making about the court or anybody else but I think that had it not been clear that the court would step in, the likelihood of there being agreement would have been greater. Because

CHIEF JUSTICE BROCK: It's not your — it's not your position that it was judicial usurpation of legislative responsibility for this court to...

ATTORNEY LEHMANN: To formulate a redistricting plan?

CHIEF JUSTICE BROCK: Yes.

ATTORNEY LEHMANN: No, my the my — language about usurpation of legislative function at this point in the proceeding has to do with the appropriation authority and the prospect of the court ordering the legislature to appropriate funds to the court.

CHIEF JUSTICE BROCK: Would you agree that we were performing a legislative function?

ATTORNEY LEHMANN: No, I believe you were performing a judicial function, it was the fact that it was a judicial function that created jurisdiction in the first place. If it were truly a legislative function then it would have been performed in a legislative function. Now I do think that this is probably one of those areas that have been discussed in the court's opinion in which there is overlap. But I don't think that every time that there's going to be overlap in the functions of the branches of Government that those branches should then be looking to each other for payment for associated costs. The Executive Branch performs judicial functions every day at administrative hearings. But, I think it would be inappropriate for them to look at the court for funding because they're performing judicial function. I think that that overlap is part of what's anticipated by the constitution, the constitution itself contains some very literary, well

thought, language concerning the ties that bind the three branches of government together. But, I do think it's inappropriate for the court to issue an order compelling the legislature to appropriate, effectively appropriate money to the court.

JUSTICE NADEAU: Mr. Lehmann, I have a observation and a question. I've been a full-time judge since 1981, the Superior Court and the Supreme Court. Prior to that, I was 13 years as a District Court Judge, part-time. In all that time, this is the most disappointing hearing at which I have ever been present. The question I have for you is this. There is no question that at least you admit this was a judicial function, you concede it was a judicial function. Your argument seems to be that there is judicial money and that there is legislative money. And that the judiciary shouldn't order the legislative money to be spent. It seems to me what we are talking about is the people's money. Everybody knows this bill was properly incurred, everybody knows this bill is going to be paid, everybody knows this bill is going to be paid by the people's money. The question I have for you is, what is the purpose that is being served here by the refusal to pay the people's bill, by the people's money in a way that doesn't bring two branches of government, the leaders of which are either here today or represented by counsel into a conflict which shouldn't be necessary. Could you answer that question for me please?

ATTORNEY LEHMANN: The reason it's necessary, I submit, is that is the same reason that its been necessary for the court to protect its own prerogatives and rights relative to separation of powers. The proposition advanced by the notion that the court would order the legislature to pay funds to the court in this instance strikes at the very core of the legislative function, which —

JUSTICE NADEAU: What you — you and the leaders know that the one thing the court does not want to do is to order the legislature to pay the funds, you know that. You also know that the funds — the bill is going to be paid and is going to be paid by the people's money. If your suggestion is that somehow the court spent money that it doesn't have or money that is being spent to serve the people in the court system, if that's your proposal and the proposal is that then the court somehow go back to the legislature to seek reimbursement, then what you're saying is that its possible for the legislature to refuse reimbursement and somehow that the people's money that should be spent on the people's obligation won't be spent. And, why does this have to be a conflict? Why does this have to be a confrontation? Why does this have to be a turf battle, when the money is there, the money was spent for the people, it saved the towns and cities from having to have another election and everybody was doing the people's

work? Doesn't it make sense for there to be a way to do this without people having to urge each other to the limit?

ATTORNEY LEHMANN: I guess I would answer that in two parts. In the first part, I can't agree more that this is the people's money. But, in the constitutional scheme of things it's the legislature, the branch of government that is in fact closest to the people that's responsible for appropriating funds and has the tightest control over those appropriations. And the second part, I don't know what the current state of the court's budget is, but my understanding from the Legislative Budget Assistant is that in the last four fiscal years the court has allowed to lapse over a half of million dollars in each of those years. So, I don't mean any disrespect to the court when I say perhaps the question should be turned around. If the money is otherwise going to lapse back to the legislature why is it necessary for the judicial branch —

JUSTICE NADEAU: Well, let me tell you a little about that, Mr. Lehmann. The court is keeping now vacant 52 positions that are supposed to be there to serve the people. They haven't filled something like 49 or 50 new positions. Judge Kelly has cut 10% of the money to be used for per diem judges so that people in the District Courts can get quicker hearings there. The court also, the Probate Court, has cut funds for per diem judges in the Probate Court. We have kept vacant 1 ½ Marital Master's positions, positions which are serving people in serious domestic relation cases. The Superior Court has cut jury trials for two counties. We have laid off 66 part-time security people. We've taken reduction from equipment lines. The point is not where and who has the most money. My concern is that this is a legitimate bill and it's a bill that should be paid by the people's funds and it shouldn't cost the people in other services to pay those funds. And, it would seem to me that there would be the same ease to pay this bill as there was to pay legal expenses without question, legal fees and expenses without question for one side, for a side that was urging us to keep in place an unconstitutional law. I don't understand why the confrontation is necessary. It's very troubling to see that it is necessary.

JUSTICE DALIANIS: Relative to the lapse, Mr. Lehmann, it sounds like a lot of money. But, when you look at the budget figures and you consider that it's spread over many different lines and we weren't allowed to over spend those lines so we had to under spend them and in the end that meant that there was a little money in a number of lines to turn back and it all added up to half a million dollars. It does not — it's not an easy answer to our budget problems and I don't expect you to be particularly sympathetic to them. The problem is, that I agree with Justice Nadeau, the last thing the court is interested in doing is ordering the legislature

around. We've never wanted to do that, we tried to stay out of redistricting. We had to incur this expense. We incurred it, and in order to get it paid from our funds, we have to go to the legislature and get permission to take it out of a line that is otherwise already used up. So, I gather that the position of the Senate, at least, is we could pay it, we don't want to pay it and we think that that's fair. Is that kind of the bottom line?

ATTORNEY LEHMANN: I don't think that exactly summarizes the Senate's position.

JUSTICE DALIANIS: No?

ATTORNEY LEHMANN: I think it's true that the Senate could pay it. I think that I'm not in a position to comment upon whether or not the Senate would vote to pay it, if there was a request for a supplemental appropriation. Obviously, I don't get a vote in those things so I can't comment about that.

JUSTICE DALIANIS: Was there any problem in getting the lawyer's fees paid? Did the Senate have to vote on paying outside counsel?

ATTORNEY LEHMANN: I don't believe so.

JUSTICE DALIANIS: Okay.

ATTORNEY LEHMAN: I guess I don't understand exactly the relationship of the legal fees to the question before the court and I didn't come prepared to address the question.

JUSTICE DALIANIS: You don't see that as a redistricting expense?

ATTORNEY LEHMANN: The question is whether it's a legislative expense. And, I don't know that it's a legislative expense for people to come to court. The people came to court happened to be senators and representatives, but there's no need for that to be the case. Any voter in the State would have had standing to bring the matter before the court. So, wha — the extent to which the lawyers agreed to represent them incurred attorney's fees doing that is anybody's guess. I don't think that the appropriation to the legislature for legislative purposes authorizes the administrative actors within the legislature to pay court — to pay costs incurred by the expense. Costs incurred by the court, excuse me. Justice Nadeau made a — effectively, a very strong argument in favor of what the court's budget should be. But again, that is a question for the entire legislature to take up.

CHIEF JUSTICE BROCK: Let me ask, I have two or three questions. Let's assume that this process had cost us — there had been more time

involved, rather than the urgency with which we addressed it — and it cost the judicial branch three million dollars and it was all legitimate expense necessary to redistricting, other State's that would certainly be a reasonable figure. Is it your position that the court would have to defer considering redistricting a State until the legislature appropriated three million dollars for it to do so?

ATTORNEY LEHMANN: No, my understanding of the way the process is designed to work is that the court approaches the legislature with an appropriation request necessary to perform all judicial functions for the biennium. The legislature may or may not appropriate what you think is necessary, but the court's responsibility is to do the best it can within the limit. And, the court has to prioritize whether it thinks that redistricting is sufficiently important to go — to go to the front of the money list and I submit that if you made the decision that it was you'd be making the right decision.

JUSTICE NADEAU: So, if the Superior Court has a capital murder trial and the legislature is not in session and they have to spend five times what is expected for a trial, they can't do that without legis — until they get the money from the legislature?

ATTORNEY LEHMANN: I think that the Superior Court should be prepared to handle all the things that the law permits to be brought before it, including a capital murder trial.

JUSTICE DUGGAN: So you're saying —

JUSTICE NADEAU: I hope you'll appear and support us the next time there is a budget, that there should be some kind of contingency fund added to the court system budget to provide for all contingencies.

ATTORNEY LEHMANN: I think that would be very appropriate thing for the judic —

JUSTICE NADEAU: Why don't you give me your address (laughter in the court) and I'll put you on the list of people to appear.

CHIEF JUSTICE BROCK: So, you're representing both the House and the Senate arguing here this morning?

ATTORNEY LEHMANN: Formally, it's my understanding, that the arguments are broken into two parts. I think it might make sense to bring everyone before the court — the arguments are the same on both sides —

CHIEF JUSTICE BROCK: I don't understand what you're telling me. We anticipated that somebody would be here to represent the House and the Speaker.

ATTORNEY LEHMANN: They're here.

CHIEF JUSTICE BROCK: Are they here to —

ATTORNEY LEHMANN: It's my understanding that they're here prep —

CHIEF JUSTICE BROCK: — participate in oral argument?

ATTORNEY LEHMAN: — yes. When we came in this morning Justice Brock, Clerk Fox informed us that we would be going one after the other, not all at the same time.

CHIEF JUSTICE BROCK: Oh, I see, okay I'm sorry. Before we let you go, do I understand that it's, at least the Senate's position, that the judicial branch has authority to spend money from its appropriation to pay this bill?

ATTORNEY LEHMANN: Yes.

CHIEF JUSTICE BROCK: And, one further question, just so there's no doubt. The money is available in these accounts that have been referred to. But, the House and the Senate for reasons of their own have decided not to appropriate funds for this purpose.

ATTORNEY LEHMANN: Appropriate —

CHIEF JUSTICE BROCK: Allocate funds.

ATTORNEY LEHMANN: — to pay the — not to — um' yes.

JUSTICE NADEAU: Well, excuse me. It's not exactly the House and the Senate, it's the members of the Joint Committee, isn't that right? The members of the Joint Committee have authority to spend funds from that committee for what they might consider to be redistricting expenses. Is that correct?

ATTORNEY LEHMANN: Legislative purposes.

JUSTICE NADEAU: Well, okay. But, they have the authority if they're persuaded that this was a legitimate expense for redistricting. It's not the Senate and not the legislature. It's not the 400 legislators and the 24 senators, it's the members of this Joint Committee.

ATTORNEY LEHMANN: There are funds that are available at the discretion of those committee — of those —

JUSTICE NADEAU: Do you know, are you able to tell us on the record or has Mr. Burling provided us with the names and titles who serve on the Joint Committee?

ATTORNEY LEHMANN: That's a matter of public record. I don't have the —

CHIEF JUSTICE BROCK: Thank you, Mr. Lehmann.

ATTORNEY DOUGLAS: It think the House is ready, Your Honor. I don't have a separate argument.

CHIEF JUSTICE BROCK: Alright. Thank you. I must confess that we're not clear what the order of presentation was going to be in the House case. But, I will assume it will be, the petitioners who will go first unless you've agreed otherwise. Mr. Hatem.

ATTORNEY HATEM: May it please the court, Your Honor. My name is Michael Hatem, I represent Peter Burling and the Democrats in this matter. I don't want to reinvent the wheel, and I completely concur with the arguments brought forth by Mr. Burling and Attorney Kacavas this morning. I would simply like to add, that I believe we all can agree that we got here, with the previous briefs because the court was acting — providing a jud. — legislative function. Redistricting is clearly a legislative function. The court cases cited in our earlier briefs and our original petition all stated that if the court was going to step into this matter, it was going to be providing a legislative function. Ultimately, the court had to provide that function. This court redistricted the State of New Hampshire because the legislature was unable to. The reason it was unable to, was because there was a gubernatorial veto. It's irrelevant how — why the legislature failed to provide a redistricted law. The fact is, the legislature did fail and the court had to act legislatively. We believe the court has authority to award — or to have the legislature pay Mr. Bowers' fees from the *Claremont III* decision, 144 N.H. 590. In that case, this court stated, "To award attorney's fees in such a suit to a plaintiff who has succeeded in establishing a cause of action is not to saddle the unsuccessful party with the expense, but to pose — impose them on the class that has benefited from them and that would have had to pay them had it brought the suit." Fairly, Mr. Bowers' fees aren't attorney's fees. But, the rational behind *Claremont III* applies. The citizens of the State of New Hampshire benefited from having a constitutional redistricting plan. Had the legislature done it, it would have had to impose — had to have paid those costs. This is the people's money. There was — it is an important constitutional right. Clearly, no constitutional right is more important than the right to vote. And, Mr. Bowers was acting as an advocate for the State

of — Citizens of the State of New Hampshire in imposing a constitutional plan for redistricting the State. A plan the legislature was incapable of proposing. And, therefore, the court acting, as the legislature, imposed the costs. These are legislative costs. As you have heard this morning from both sides, there is money in the Joint Fiscal Committee to pay these costs. My understanding is the committee can be called — called back into session at the call of the Chair and this vote can occur in short order. The whole entire Senate and House does not have to come back into session. Therefore, we believe that this is a proper cost for the legislature and we believe its supported by *Claremont III* as well as a previous case, as Attorney Kacavas noted, *Finch v. Conner* and that's all I have.

CHIEF JUSTICE BROCK: Thank you.

ATTORNEY HATEM: Thank you.

ATTORNEY MILLER: Good morning. May it please the court, I am Betsy Miller and I represent the House of Representatives. This is a difficult place to be right now. We feel the same way you do about this and setting up this kind of confrontation is really not good for either branch. But, I guess I want to answer some of your questions again about some of the details about how the legislative budget functions, how these two committees, the Fiscal Committee and the Facilities Committee, function because I think there's some misunderstanding about how spending occurs in — out of the legislative budget. The Legislative Fiscal Committee did not approve payment of the legal fees. They have no jurisdiction whatsoever over the legislative budget. The Legislative Facilities Committee, which is made up basically of leadership of the Senate and the House and of both parties has jurisdiction over the legislative budget. They make personnel decisions, they do raise decisions, hiring decisions. The Speaker and the President have authority to spend out of the lines that have been established in the legislative budget, which, as your budget does, goes through the whole budget process from the House Finance Committee to the Senate Finance Committee and to both bodies. And, it's set so that appropriations are itemized by line and the Speaker and the President can make — can spend out of lines that are specifically appropriated for legislative purposes.

CHIEF JUSTICE BROCK: May I ask you a question Ms. Miller. We've been told that the Senate has $1,976,000 remaining, the House $3,601,000. Is it true or not that, with respect to those funds, it doesn't require action by the Joint Facilities Committee that each body of the House can decide, or the leadership of each body of the House can decide how that money's spent?

ATTORNEY MILLER: That is true.

JUSTICE DALIANIS: And, they don't want to spend it on this bill. I take it that's your bottom line.

ATTORNEY MILLER: The position of the House, as I am here to present it today, is that the expenses of Bobby Bowers were not a legislative expense. We continue to believe that that was a judicial expense in all its characteristics.

JUSTICE DALIANIS: And notwithstanding that belief, and though there might be differences of opinion about it, they aren't even willing to pay the bill in the spirit of good will. We don't have the money. You folks apparently do. And I'm just trying to figure out why the House and Senate leadership think this is fair.

ATTORNEY MILLER: I don't think it's a question of whether we have the money or you have the money. If it was a $2000 bill, I think that we'd be in the same position we're in now.

JUSTICE DALIANIS: And, you think that's fair?

ATTORNEY MILLER: I can't answer whether I think that's fair or not. I think that what the House is doing is saying, they've determined it's not a legislative expense.

CHIEF JUSTICE BROCK: Do you agree that it's a legal issue as to whether this is a legislative expense or a judicial expense?

ATTORNEY MILLER: I think it's more of a factual issue, actually. I think in the way that the court handled the hiring and the utilization of the technical advisor.

CHIEF JUSTICE BROCK: But, it's a decision for the court to make ultimately.

ATTORNEY MILLER: You're ultimately here to make that decision today.

CHIEF JUSTICE BROCK: And, if this court were to make the decision that this was a legitimate judicial expense or legislative expense, whichever we determine, I assume that your recommendation to your clients would be that they recognize that decision.

ATTORNEY MILLER: I think my recommendation to my client would be confidential. I would follow all ethical guidelines that I'm subject to and

JUSTICE NADEAU: Can I ask you a question, and this is not something that I've discussed with my colleagues: But, if we were to say that we're not going to issue an order in this case for two weeks or 30 days to give you the opportunity to take the tapes of this argument to whoever's in charge, whether it's the leadership or whether it's the Joint Committee, so that they can hear the arguments here, the questions here first hand, so that they can assess the depth with which we are trying to avoid this confrontation. So, that they can decide whether as a matter of comity or whether as a matter of decision making, after hearing those tapes and after hearing what was said by everybody here, that they might either reconsider or decide that to pay the people's bill with the people's money is the right thing to do for the people, for the government and for the branches of government. Is that something that you would recommend and would be willing to do?

ATTORNEY MILLER: I would certainly be willing to do that.

JUSTICE NADEAU: Alright, thank you.

JUSTICE DUGGAN: If Mr. Bowers remains unpaid for a period of time and sues and obtains a judgment on the amount that he is owed with interest, I assume, the State would pay the judgment.

ATTORNEY MILLER: I assume that would occur.

JUSTICE DUGGAN: How would you pay it?

ATTORNEY MILLER: I think, probably, the Attorney General would be handling that one. So, I can't really answer that.

JUSTICE DUGGAN: But, there's no doubt that you'd pay the judgment?

ATTORNEY MILLER: I believe the judgment would have to be paid.

CHIEF JUSTICE BROCK: With attorney's fees and interest.

ATTORNEY MILLER: Probably.

CHIEF JUSTICE BROCK: Well, I interrupted you and it's turned into a lengthy interruption with questions. But, if you want to complete your remarks, we'd appreciate it.

ATTORNEY MILLER: I just have one more concern that I want to express on behalf of the House and perhaps it's why the House is so adamant in characterizing the technical advisors expenses as a judicial expense. And that is, that we believe that redistricting is a very public matter and we did have some concern at the time that the — everything

that's surrounding Bobby Bowers was done in-camera and confidentially, as you have the right to do. But, there was some concern and I think it was expressed even by the petitioners at one point, that before an order — a redistricting order — plan became final, that the parties would have an opportunity to have some input in that. And, so that that would make it a more public matter. And, as you know, the House is subject to the right-to-know law, we do everything in public and that's a concern of the characterization of the expenses of the technical advisor and how he — and how you worked with him.

JUSTICE NADEAU: Of course, the Secretary of State and all the town selectman were screaming bloody murder that if we didn't hurry up and get this decision out they'd have to have two elections, they'd have to spend millions of dollars and that certainly was some consideration.

ATTORNEY MILLER: But, conceivably, as other courts do — take up redistricting, there are instances in which the fact-finding is done in public. The parties had experts, we had people familiar with the software and familiar with the numbers, all sides did that could have come before you and created plans that you wanted them to create.

CHIEF JUSTICE BROCK: Did the House object at the time to the appointment of Mr. Bowers?

ATTORNEY MILLER: No, absolutely not. But, because the court is — can — you have the inherent authority to appoint such a technical advisor.

CHIEF JUSTICE BROCK: You had an opportunity to object to his appointment, but you didn't.

ATTORNEY MILLER: That's right. But, we're now objecting to — we — we still don't object to your inherent authority to have a technical advisor as a judicial expense. That — we don't object to that.

JUSTICE DALIANIS: Relative to the public nature of the fact finding counsel, I think that no group more than the court would have been happy to have more time —

ATTORNEY MILLER: Yes, ma'am.

JUSTICE DALIANIS: — so that such a process could have played out publicly. But, if — I'm sure you do recall, we were left with a window of about this wide to deal with the problem and felt there was no other way to approach it.

ATTORNEY MILLER: Yes, I understand.

CHIEF JUSTICE BROCK: Finally, I wanted to ask a question I asked of the Senate. Is it the position of the House that this court usurped legislative responsibilities when it engaged in the redistricting process.

ATTORNEY MILLER: Absolutely not. Thank you.

CHIEF JUSTICE BROCK: Is there anything further? If not, the matter —

JUSTICE DALIANIS: Mr. Carter.

ATTORNEY CARTER: I have nothing further to add.

CHIEF JUSTICE BROCK: Okay, sorry I didn't mean to overlook you. We'll be in recess. Thank you.

### Order dated December 31, 2002

The court having been notified by the Attorney General that the State has agreed to pay the technical advisor's bill for services, there is no need for a further order. These cases are closed.

Brock, C.J., and Nadeau, Dalianis, and Duggan, JJ., concurred.